RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2001 FED App. 0052P (6th Cir.)
File Name:  01a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LOUIS P. CARDAMONE,
     *Plaintiff-Appellant,*

     *v.*

    No. 99-6445

WILLIAM H. COHEN, et al.,
     *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No.  97-00540—John G. Heyburn II, District Judge.

Argued:  October 25, 2000

Decided and Filed:  February 28, 2001

Before:  SUHRHEINRICH, DAUGHTREY, and MOORE,
Circuit Judges.

---

## COUNSEL

**ARGUED:**  Edwin S. Hopson, WYATT, TARRANT &
COMBS, Louisville, Kentucky, for Appellant.  Terry M.
Cushing, ASSISTANT UNITED STATES ATTORNEY,
Louisville, Kentucky, for Appellees. **ON BRIEF:** Edwin S.
Hopson, WYATT, TARRANT & COMBS, Louisville,
Kentucky, for Appellant.  Terry M. Cushing, Marisa J. Ford,

Cardamone's Privacy Act claims based on §§ 552a(e)(2) and 552a(e)(3) in its entirety.

ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellees.

————————

**OPINION**

————————

KAREN NELSON MOORE, Circuit Judge. The Plaintiff, Louis P. Cardamone, appeals the district court's grant of summary judgment to the Defendants, the United States Department of Defense, Domestic Dependent Elementary and Secondary Schools ("DDESS"), the Secretary of Defense, and Lillian Gonzalez, the Director of the Department of Defense Education Activity. Cardamone claims that DDESS violated his rights under the Privacy Act of 1974 codified at 5 U.S.C. § 552a, when DDESS failed to elicit information "to the greatest extent practicable" directly from him during the course of an investigation concerning Cardamone's managerial practices as Superintendent of the Fort Knox Community Schools ("FKCS"). Cardamone also claims that DDESS violated the Privacy Act's requirement that an agency inform witnesses of the "principal purpose" of the investigation. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment in favor of DDESS with respect to all of Cardamone's claims under the Privacy Act.

## I.  FACTS AND PROCEDURE

This case centers around an investigation conducted by DDESS into allegations of hostile managerial practices and other misconduct by Cardamone in his capacity as Superintendent of the Fort Knox Community Schools ("FKCS"). The FKCS is one of several school systems operated by DDESS under 10 U.S.C. § 2164 (formerly 20 U.S.C. § 241), which serve to provide an education to the children of the members of the U.S. Armed Forces. Cardamone served as Superintendent of FKCS from July 1, 1994 until his termination from federal service on June 28, 1996. The investigation at issue in this case was prompted on

that (1) DDESS failed to notify the witnesses of the principal purpose of the investigation; (2) its actions had an adverse effect on Cardamone; and (3) it willfully or intentionally violated this provision of the Act. *See* 5 U.S.C. 552a(e)(3); 552a(g)(1)(D); 552a(g)(4). The district court granted summary judgment as to Cardamone's § 552a(e)(3) claim and concluded that the Privacy Act does not require that the results of the investigation be disclosed, merely the investigation's purpose. The district court further concluded that there was a lack of a causal connection between the failure of DDESS to inform witnesses of the "principal purpose" of the investigation and the claimed adverse effect of mental injuries which Cardamone alleges. J.A. at 58 n.5 (D. Ct. Mem.).

Cardamone alleges that the depression that he and his wife suffered constitute the adverse effects caused by DDESS's failure to comply with § 552a(e)(3) by neglecting to inform witnesses of the principal purpose of the investigation. The district court properly concluded that "[t]here is no evidence that any of the witnesses in this case would have testified differently, or not at all, had they known more about the purpose of the investigation, nor is there any evidence that Mr. Cardamone suffered as a result of the way in which interviews were conducted. Without some causal link to harm, no reasonable jury could find for the Plaintiff on this claim." J.A. at 58 n.5 (D. Ct. Mem.). The absence of a causal connection between Cardamone's alleged adverse effects of depression and the failure of DDESS to inform witnesses that the principal purpose of the investigation was to assess allegations regarding Cardamone's role as Superintendent is fatal to Cardamone's § 552a(e)(3) claim. Accordingly, we affirm the district court's grant of summary judgment to DDESS as to Cardamone's § 552a(e)(3) claim under the Privacy Act.

### III. CONCLUSION

Based upon the foregoing, we **AFFIRM** the district court's order granting DDESS's motion for summary judgment as to

November 21, 1995, when four FKCS administrators sent a letter complaining about and requesting an investigation into Cardamone's management practices to Dr. Lillian Gonzalez, the Director of the Department of Defense Education Activity. This letter described the management climate as "hostile and counterproductive to our mission," expressed "real concern regarding retaliation," and stated that "[m]anagement by intimidation and harassment is the best characterization of [Cardamone's] tenure at Fort Knox." Joint Appendix ("J.A.") at 45 (Letter of four FKCS administrators to Dr. Gonzalez and Dr. Nevarez). On December 8, 1995, Dr. Hector O. Nevarez, then Director of DDESS, formally requested its General Counsel, Robert Sutemeier, to conduct an investigation into these complaints about Cardamone's performance as Superintendent of FKCS.

The DDESS investigation resulted in ten allegations, which in summary are that Cardamone: (A) "inappropriately obtained or accepted on-base housing at Fort Knox, as well as commissary and exchange privileges"; (B) knowingly approved sick leave for the Fort Knox High School principal to travel to Puerto Rico to sell his house; (C) "approved or assented to the purchase of athletic shoes for the high school basketball team from the school Extra Curricular Account"; (D) failed and/or delayed carrying out the proper orders and directives of his superiors regarding responsibility for certain personnel functions; (E) "engaged in a pattern of disrespectful, abusive, insulting, demeaning, and intimidating conduct toward some subordinate employees of the [FKCS], and has thus created a hostile working environment characterized by fear and low morale which is counterproductive to the mission of the [FKCS]"; (F) "reprised against certain employees of the [FKCS] who had complained directly to the Fort Knox Board of Education about Mr. Cardamone's abusive and harassing conduct, by threatening them with a charge of insubordination if they ever engaged in similar actions in the future"; (G) "engaged in 'preselection' and disregarded federal merit selection principles in the hiring process of a Junior ROTC instructor for the Fort Knox High School"; (H) retaliated against Gary

Doolittle, a FKCS employee "who filed an EEO complaint and complained directly to the Fort Knox Board of Education, the Director of the [Department of Defense] Education Activity, and DDESS Director, about Mr. Cardamone's abusive and harassing conduct, by curtailing his duties and job responsibilities, and by engaging in acts of harassment and public embarrassment"; (I) disregarded normal duty hours; (J) "has been derelict in his obligation to visit the individual schools under his supervision, inattentive to the social responsibilities of his position as Superintendent, and, in addition, on at least one occasion, 31 December 1995, his conduct at a social gathering in Louisville was perceived as boorish and offensive." J.A. at 87-88 (Investigation Report 3/11/96).

Before the investigation commenced, Sutemeier informed Cardamone that an investigation would be underway soon. Sutemeier's investigation took place in Fort Knox, Kentucky during December 13-19, 1995 and January 16-24, 1996. Justin Schaffer, DDESS Program Manager, and Gregory Stallworth, Equal Employment Opportunity Specialist, assisted Sutemeier with the investigation from January 16-19, 1996. On December 14, 1995, Sutemeier met personally with Cardamone and his attorney and provided Cardamone with copies of the letters that prompted the investigation. Sutemeier advised Cardamone that, because he was still serving as the Superintendent of the FKCS and several of the complainants were his subordinates, Cardamone should "be careful in his comments and actions, as even casual conversations might be construed as subtle coercion." J.A. at 82 (Sutemeier Decl. at ¶ 11). Sutemeier "felt this admonition to Mr. Cardamone was necessary to counteract a professional manager's instinct to solve problems by communicating with his staff." J.A. at 82 (Sutemeier Decl. at ¶ 11).

In total, Sutemeier interviewed sixty-one witnesses over the course of the investigation. According to Sutemeier, "[a]lthough the investigation was directed towards allegations about Mr. Cardamone, it was expanded to include almost anything that anybody wanted to come in and talk about. For

those claims, and then to interview third-party witnesses as to the more subjective claims. In *Brune v. IRS*, the plaintiff pursuing a § 552a(e)(2) claim raised a similar argument as Cardamone does, namely "that the IRS investigation was not conducted reasonably, *i.e.*, could have proceeded practicably without jeopardizing his reputation." *Brune*, 861 F.2d at 1288. The D.C. Circuit in *Brune* explained that the plaintiff "focuses on the wrong question, however, when he maintains, ex post, that a simple meeting with investigators at the outset would have laid to rest any suspicion of criminality involving his travel vouchers. Under appellant's own standard, the relevant inquiry under section (e)(2) concerns, as it must, the reasonableness of the investigator's decision to contact a third party viewed at the time it was made, with all the uncertainties attendant upon an investigation at its initial stages." *Id.*

We agree with the district court that Cardamone's § 552a(e)(2) claim must fail as a matter of law. The Privacy Act does not require an agency to conduct its investigation piecemeal, or to interview witnesses in any particular order, when there are both subjective and objective complaints to be investigated. Cardamone cannot demonstrate a genuine issue of material fact as to whether DDESS failed to collect information from him to the greatest extent practicable. Because Cardamone cannot establish this critical first element of his claim under § 552a(e)(2), we do not need to determine whether the defendants acted willfully or intentionally or whether the defendants' actions had an adverse impact on Cardamone.

## C. Section 552a(e)(3) - Requirement of Informing Interviewees of the True Purpose of Investigation

We now turn to Cardamone's second Privacy Act claim. Section 552a(e)(3) requires an agency to "inform each individual whom it asks to supply information" of "the principal purpose or purposes for which the information is intended to be used." 5 U.S.C. § 552a(e)(3). To prevail on a claim arising under § 552a(e)(3), Cardamone must establish

Cardamone alleges that he had objective, unalterable information with respect to allegations A, B, C, D, F, G, J, I, for which Sutemeier could have approached him before seeking information from third parties.[6] *See* Appellant's Br. at 16-20. Cardamone argues that Sutemeier was not concerned with his veracity and "[r]ather than seek this information directly from Mr. Cardamone and thereby restrict the scope of the investigation, Mr. Sutemeier chose to seek such objective and unalterable information from at least 60 other persons before ever speaking with Mr. Cardamone on any of those issues." Appellant's Br. at 20.

The district court correctly concluded that DDESS is not required under the Privacy Act to divide its investigation piecemeal into the allegations that could possibly be resolved by objective information, and approach Cardamone first as to

---

working environment characterized by fear and low morale." Allegation H involved Cardamone's alleged reprisal against Mr. Doolittle for filing various complaints about Cardamone's conduct. Allegation J concerned Cardamone's failure to satisfy his obligation to visit the schools under his supervision and boorish behavior at a social gathering. J.A. at 87-88 (Investigation Report).

[6] Allegation A claimed that Cardamone "inappropriately obtained or accepted on-base housing at Fort Knox, as well as commissary and exchange privileges." Allegation B involved Cardamone's knowing approval of sick leave for a principal to travel to Puerto Rico to sell his house. Allegation C maintained that Cardamone "approved or assented to the purchase of athletic shoes for the high school basketball team from the school Extra Curricular Account." In Allegation D, Cardamone was charged with failing and or delaying to carry out the proper orders and directives of his superiors regarding responsibility for certain personnel functions. Allegation F stated that Cardamone "reprised against certain employees of the [FKCS] who had complained directly to the Fort Knox Board of Education about Mr. Cardamone's abusive and harassing conduct, by threatening them with a charge of insubordination if they ever engaged in similar actions in the future." Allegation G involved a claim that Cardamone "engaged in 'preselection' and disregarded federal merit selection principles in the hiring process of a Junior ROTC instructor for the Fort Knox High School." In Allegation I, Cardamone was charged with disregarding normal duty hours. J.A. at 87-88 (Investigation Report).

---

example, they have a lot of pay problems up there, and I interviewed . . . four or five people who came in who didn't have any knowledge or anything to say about Mr. Cardamone but they were concerned about their pay, and I listened to what they had to say." J.A. at 263 (Sutemeier Dep.). To facilitate witnesses coming forward in the investigation, Sutemeier "directed the site office there to put a notice out that [he] was there and if anybody had any complaints, almost anything concerning the operation of the district, [he] would be there to listen to what they had to say." J.A. at 263 (Sutemeier Dep.). According to Sutemeier, the contents of the notice that was posted was "something to the extent that stated [his] name and [his] position and that [he] was there . . . doing an overall look-see of the district, and if anybody wanted to come and talk all they had to do was call . . . to make an appointment. Now, of course, that was in addition to the people that [he] selected [him]self." J.A. at 263-64 (Sutemeier Dep.).

Sutemeier acknowledged that on his own initiative, he interviewed a number of persons who were "not employees of the Fort Knox community school system [and who] were not under the supervision of Mr. Cardamone." J.A. at 275 (Sutemeier Dep.). A few of these witnesses, however, were Cardamone's former subordinates. Before formally interviewing Cardamone, who was the last person whom Sutemeier interviewed, Sutemeier provided Cardamone with a list of topics to be covered during the interview. On January 23, 1996, Sutemeier interviewed Cardamone for five hours.

On March 11, 1996, Sutemeier submitted a "Report of Investigation, Allegations Concerning the Conduct of Mr. Louis P. Cardamone, Superintendent, Fort Knox Community Schools, Fort Knox, Kentucky," to DDESS.[1] Sutemeier concluded that as to allegations A, B, and C "the evidence collected did not substantiate the allegation," J.A. at 90-92

---

[1] Sutemeier did not submit any report concerning pay problems at FKCS or any other allegations about the operations of FKCS outside of the complaints regarding Cardamone.

(Investigation Report), and that as to allegations D, E, F, G, H, I, and J, "the evidence collected substantiated the allegation." J.A. at 93-114 (Investigation Report). On March 29, 1996, Dr. Nevarez, Director of DDESS, proposed to Dr. Gonzalez, Director of Department of Defense Education Activity, that Cardamone be removed from federal service. On June 28, 1996, Dr. Gonzalez sent Cardamone a memorandum removing him from his position as Superintendent of FKCS effective that same day.

On August 20, 1997, Cardamone filed a complaint in U.S. district court seeking relief under the Privacy Act of 1974, codified at 5 U.S.C. § 552a. Cardamone alleged that DDESS violated 5 U.S.C. § 552a(e)(2) which requires an agency "to collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2). Cardamone's § 552a(e)(2) claim stems from the failure of DDESS to approach him directly for information before interviewing sixty-one other witnesses. Having alleged in his complaint that DDESS's violation of § 552a(e)(2) had an "adverse effect" on him, Cardamone in effect sought a civil remedy under 5 U.S.C. § 552a(g)(1)(D). As provided by 5 U.S.C. § 552a(g)(4), Cardamone sought damages, reasonable attorney fees, and other litigation costs.

In response, DDESS moved for summary judgment. On December 2, 1997, Cardamone filed a brief in opposition to DDESS's motion for summary judgment and requested additional time for discovery. The district court referred this case to a magistrate judge who entered his proposed Findings of Fact, Conclusions of Law, and Recommendation ("R&R") and concluded that it was appropriate for DDESS to have interviewed other witnesses before interviewing Cardamone. The magistrate judge found that "[t]here is ample proof in the record that Cardamone was an overbearing and intimidating manager. It was both practical and lawful for the investigator to take statements from other witnesses so that Cardamone could not 'poison the well.'" J.A. at 142 (R&R). The

information directly from the subject of the investigation to the greatest extent practicable. Here, as in *Hudson,* there are "practical considerations" of threats and intimidation of fellow co-workers. *Hudson*, 130 F.3d at 1205. In contrast to *Waters*, 888 F.2d at 873-74, the present case involves multiple allegations, some of which could possibly be resolved by requesting objective information from Cardamone, as well as the more subjective allegations of employee mistreatment which lie at the heart of the concerns which triggered DDESS's investigation from the beginning. *See* J.A. at 45 (Letter of four FKCS administrators to Dr. Gonzalez). In *Dong*, there were no allegations that the plaintiff would engage in witness tampering, whereas in this case, the allegations against Cardamone included retaliation against employees who filed complaints against him and mistreatment of his subordinates. *See Dong*, 943 F. Supp. at 72-73. Thus, the instant case which involves an investigation that originates from Cardamone's alleged mistreatment of employees who are highly likely to be interviewed by DDESS presents a different situation from *Dong,* where there was no indication of potential witness harassment or mistreatment. In *Brune*, the D.C. Circuit looked to the allegations of false statements as a justification for the IRS to approach third-party witnesses before eliciting the information from the plaintiff. *See Brune*, 861 F.2d at 1288. Although the present case does not involve charges of false statements, it is similarly impracticable to think that charges of employee mistreatment and harassment could be resolved by interviewing Cardamone before others.

In addition to the practical considerations at play in this case, DDESS is not required under the Privacy Act to conduct its investigation piecemeal when the investigation involves both objective and subjective allegations. Cardamone maintains that only three (allegations E, H, and J) of the ten allegations against him involved employee mistreatment.[5]

---

[5] Allegation E provided that "Mr. Cardamone has engaged in a pattern of disrespectful, abusive, insulting, demeaning, and intimidating conduct toward some subordinate employees . . . and has thus created a hostile

*mistreatment.*"    J.A. at 55 n.2 (D. Ct. Mem.) (emphasis added).

In *Hudson*, a former Assistant United States Attorney sued the Attorney General and the U.S. Department of Justice alleging claims under Title VII, the Equal Pay Act, and the Privacy Act. *Hudson*, 130 F.3d at 1196. The plaintiff sought recovery under the Privacy Act based on the government's violation of § 552a(e)(2). Hudson alleged that the government questioned others when such information could have been elicited directly from the plaintiff herself. Hudson also claimed that the government spread false rumors about her and released information to those not authorized to receive such information in violation of § 552a(b). The plaintiff also alleged that the Justice Department made decisions about her based on a "secret" file and that the U.S. Attorney's Office violated § 552a(d) when it failed to amend certain records pertaining to her. With respect to Hudson's "greatest extent practicable" claim, we held that the "practical considerations" at stake in that case, namely that "Hudson was suspected of making false statements and she was allegedly intimidating and threatening people and otherwise dividing the U.S. Attorney's office," "demonstrate that [the investigator] did not violate the Privacy Act when he interviewed others before interviewing Hudson." *Id.* at 1205. In reaching this conclusion, we cited to *Brune v. IRS*, 861 F.2d 1284, 1288 (D.C. Cir. 1988), in which the D.C. Circuit held that the agency did not violate the "greatest extent practicable" provision and was thus not required to interview the subject first where the subject was being investigated for making false statements. ("[T]he nature of the investigation challenged here under the Privacy Act, involving possible false statements by an IRS agent, made it impracticable for the investigating authority to collect the information it needed directly from the subject individual."). *Id.*

*Hudson, Waters, Dong*, and *Brune* demonstrate that the specific nature of each case shapes the practical considerations at stake that determine whether an agency has fulfilled its obligation under the Privacy Act to elicit

magistrate judge thus recommended denying Cardamone's Rule 56(f) motion as well as granting summary judgment to DDESS.

The district court declined to accept the magistrate judge's R&R. Although the district court expressed some hesitation, ("the Court is not certain that any facts uncovered would support a plausible legal theory for recovery"), the district court granted Cardamone an opportunity to conduct additional discovery. J.A. at 153 (July 8, 1998 J.). After discovery was completed, Cardamone filed an amended complaint on December 3, 1998 adding the claim that DDESS violated 5 U.S.C. § 552a(e)(3) by failing to "inform each individual whom it asks to supply information . . . [of] the principal purpose or purposes for which the information is intended to be used." 5 U.S.C. § 552a(e)(3). On December 31, 1998, the district court entered a Memorandum and Order denying DDESS's motion for summary judgment and granting Cardamone leave to amend his complaint. *See* J.A. at 330 (Mem. and Order). The district court specifically acknowledged that, "[t]his case involves a number of less than clear questions about the purposes of the Privacy Act and the application of particular facts to that Act. The Court does not feel comfortable granting summary judgment on the record at hand and, therefore, concludes that a trial on these issues is most appropriate." J.A. at 329 (Mem. and Order). The district court set trial for May 17, 1999. DDESS, however, answered Cardamone's amended complaint with a second motion for summary judgment as to all of Cardamone's claims. On September 30, 1999, the district court granted DDESS's second motion for summary judgment, concluding that Cardamone "cannot sustain a claim under the Privacy Act." J.A. at 54 (Mem. and Opinion). This timely appeal by Cardamone followed.[2]

---

[2]Apart from this litigation, Cardamone also sought internal administrative remedies concerning his termination from federal service.

## II. ANALYSIS

We review a district court's grant of summary judgment de novo. *See Richardson v. Township of Brady*, 218 F.3d 508, 512 (6th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We construe all facts and inferences drawn therefrom in the light most favorable to Cardamone, the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Summary judgment is appropriate after sufficient time for discovery if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A. The Privacy Act

We review the district court's legal conclusions de novo and the findings of fact for clear error. *See Hudson v. Reno*, 130 F.3d 1193, 1198 (6th Cir. 1997), *cert. denied*, 525 U.S. 822 (1998). "The Privacy Act of 1974 regulates the collection, maintenance, use, and dissemination of information concerning individuals. The Act attempts to strike a balance between the government's need to collect and maintain information and the privacy interests of the persons to whom such information pertains." *Id.* at 1204. "Each agency that maintains a system of records" is subject to the Privacy Act requirements. 5 U.S.C. § 552a(e). The Act borrows the definition of "agency" provided by the Freedom of Information Act, 5 U.S.C. § 552(f), which provides that "[f]or purposes of this section, the term 'agency' as defined in section 551(1) of this title includes any executive department

claim under § 552a(e)(2), and the D.C. Circuit held that the Justice Department violated the "greatest extent practicable" provision by failing to ask the plaintiff to produce his attendance ticket at the Pennsylvania state bar exam before inquiring about the plaintiff's attendance from the state bar authorities. The court reasoned that "[i]f [the subject] had been unable to produce satisfactory objective proof of his attendance, then the Department would not have violated the Privacy Act by attempting to obtain the information directly from the Pennsylvania Board." *Id.* at 874. The *Waters* court maintained that even if the plaintiff's credibility was somewhat questionable and despite the close proximity between two instances of alleged impropriety, nonetheless the government "cannot justify failing to go first to [the subject] for objective proof of his bar attendance, proof such as written correspondence informing him of his bar results, and his bar exam admittance ticket." *Id.* "In the context of an investigation that is seeking objective, unalterable information, reasonable questions about a subject's credibility cannot relieve an agency from its responsibility to collect that information first from the subject." *Id.* at 873.

In *Dong v. Smithsonian Institution*, the court found a violation of § 552a(e)(2) where the agency did not allege and the record did not reflect any problems with plaintiff's credibility, there were no allegations of witness tampering, and no prior impropriety that would lead the agency to question the plaintiff's veracity.[4] *Dong,* 943 F. Supp. at 72-73. In the present case, the district court concluded that in *Waters* and *Dong*, "the investigators sought to verify facts which the courts viewed as being capable of objective determination. In each case the courts said that the plaintiffs could have provided that objective verification. *Our case is different in that Plaintiff could not have verified any conclusions as to the more subjective allegations of employee*

---

[4] In *Dong v. Smithsonian Inst.*, 125 F.3d 877, 878 (D.C. Cir. 1997), the D.C. Circuit reversed the district court's determination that the Smithsonian Institution was an "agency" subject to the Privacy Act. *See also Dong v. Smithsonian Inst.*, 878 F. Supp. 244, 250 (D.D.C. 1995).

individual before making a determination based on that information.

OMB Privacy Act Guidelines, 40 Fed. Reg. 28,961 (July 9, 1975). The Privacy Act is "fundamentally concerned with privacy. It supports the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government . . . a principle designed to insure fairness in information collection which should be instituted wherever possible." *Waters*, 888 F.2d at 875 (internal quotation omitted).

The district court in the present case concluded that because of the "practical considerations" involved here, DDESS complied with the Privacy Act's requirements of gathering information from Cardamone to the greatest extent practicable. "Allegations against Plaintiff included abuse of subordinates, retaliation against employees, inappropriate conduct at social gatherings and disregard for normal duty hours. *Evidence solely within Plaintiff's knowledge would not have disposed of these allegations. The allegations are inherently subjective and impossible to establish through empirical evidence.* To question others with information pertaining to the allegations was inevitable." J.A. at 56 (D. Ct. Mem.) (emphasis added). The district court added, "[i]n these circumstances, to interview those persons prior to Plaintiff is not a violation of the Privacy Act. On this basis alone, Plaintiff's § 552a(e)(2) Privacy Act claim must be dismissed." J.A. at 56 (D. Ct. Mem.) (citation omitted).

In its analysis the district court distinguished Cardamone's case from *Waters v. Thornburgh* and *Dong v. Smithsonian Institution*. In *Waters*, the plaintiff, an employee of the U.S. Department of Justice, requested federal leave to prepare for and to take the Pennsylvania bar examination. *Waters*, 888 F.2d at 871. Shortly thereafter, the plaintiff again requested federal leave, this time for jury duty. Suspicions arose concerning the validity of the plaintiff's leave requests and the Justice Department conducted an investigation accordingly. The plaintiff in *Waters* brought a Privacy Act

. . . ." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 878 (D.C. Cir. 1997), *cert. denied,* 524 U.S. 922 (1998). Cardamone's complaint lists the "United States Department of Defense, Education Activity, Domestic Dependent Elementary and Secondary Schools" as a defendant in this action.[3] As an executive department, the Department of Defense falls squarely within the definition of "agency" and is thus properly subject to the requirements of the Privacy Act.

Cardamone brings two claims under the Privacy Act. His first claim is based on § 552a(e)(2) which specifies that "[e]ach agency that maintains a system of records shall . . . collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2). Cardamone brings a second claim under § 552a(e)(3) of the Privacy Act which requires an agency to "inform each individual whom it asks to supply information . . . [of] the principal purpose or purposes for which the information is intended to be used." 5 U.S.C. § 552a(e)(3).

Under the Privacy Act, an individual may bring a civil action against an agency that fails to comply with any provision of the Act "in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D). To recover damages, a plaintiff must establish "that the agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). Upon such a showing, "the United States shall be liable to the individual in an amount equal to the sum of — (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and (B) the costs of the action together with reasonable attorney fees as determined by the court." 5 U.S.C. § 552a(g)(4). Accordingly, for Cardamone to recover damages under either

---

[3]Cardamone also lists the Secretary of Defense William Cohen and Dr. Lillian Gonzalez, Director of the Department of Defense Education Activity, as defendants in their official capacities.

of his Privacy Act claims, Cardamone must demonstrate that (a) DDESS's violation adversely affected him, and (b) DDESS violated the relevant provision willfully or intentionally.

**B. Section 552a(e)(2) - Requirement of Seeking Information From the Subject to the Greatest Extent Practicable**

We first address Cardamone's § 552a(e)(2) claim. The Office of Management and Budget ("OMB") promulgated Privacy Act Guidelines contemporaneously with the Act that "provide that when conducting an investigation into a particular person, third party sources may be contacted first when practical considerations, such as confirming or denying false statements, require this or when the information can only be obtained from third parties." *Hudson*, 130 F.3d at 1205 (citing OMB Privacy Act Guidelines, 40 Fed. Reg. 28,948, 28,961 (July 9, 1975) ("Practical considerations . . . may dictate that a third party source . . . be used as a source of information in some cases . . . [I]t may well be that the kind of information needed can only be obtained from a third party.")). Section 552a(e)(2) "reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information 'directly from the individual whenever practicable.'" *Waters v. Thornburgh*, 888 F.2d 870, 874 (D.C. Cir. 1989) (quoting OMB Privacy Act Guidelines, 40 Fed. Reg. 28,949, 28,961 (July 9, 1975)). Cardamone alleges that DDESS violated § 552a(e)(2) of the Privacy Act when its General Counsel, Sutemeier, approached sixty-one people before eliciting information from Cardamone directly.

To survive summary judgment, Cardamone must establish a genuine issue of material fact as to each of the following elements: "(1) that defendant failed to elicit information about plaintiff 'to the greatest extent *practicable*' from plaintiff; (2) that the violation of the Act was intentional or willful; and (3) that defendant's actions had an adverse impact on plaintiff." *Hudson*, 130 F.3d at 1205 (citing 5 U.S.C.

§§ 552a(e)(2); 552a(g)(4); 552a(g)(1)(D)). The district court considered only the first requirement and concluded that because the Privacy Act does not prescribe the order in which witnesses are interviewed, DDESS did not violate the Privacy Act's requirement of eliciting information from Cardamone "to the greatest extent practicable."

The first element we must consider is whether DDESS failed to elicit information directly from Cardamone "to the greatest extent practicable." 5 U.S.C. § 552a(e)(2). The point of the "greatest extent practicable" provision "is not to give the agency the option of choosing which source — the subject of the investigation or some third party — would provide the most accurate information; rather, it reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information 'directly from the individual whenever practicable.'" *Waters*, 888 F.2d at 874 (citing OMB Privacy Act Guidelines, 40 Fed. Reg. 28,949, 28,961 (July 9, 1975)).

According to the OMB Privacy Act Guidelines,

In analyzing each situation where it proposes to collect personal information from a third party source, agencies should consider[:]

[1] The nature of the program: i.e., it may well be that the kind of information needed can only be obtained from a third party such as investigations of possible criminal misconduct; [2] The cost of collecting the information directly from the individual as compared with the cost of collecting it from a third party; [3] The risk that the particular elements of information proposed to be collected from third parties, if inaccurate, could result in an adverse determination; [4] The need to insure the accuracy of information supplied by an individual by verifying it with a third party or to obtain a qualitative assessment of his or her capabilities (e.g., in connection with reviews of applications for grants, contracts or employment); and [5] Provisions for verifying, whenever possible, any such third-party information with the