Latchmie **TOOLASPRASHAD,**
Appellant,

v.

**BUREAU OF PRISONS,**
et al., Appellees.

No. 00-5424.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 2002.

Decided April 19, 2002.

Jeffrey Raskin, Student Counsel, argued the cause as amicus curiae on the side of appellant. With him on the briefs were Steven H. Goldblatt, appointed by the court as amicus curiae, and Sheri Klintworth, Student Counsel.

Latchmie Toolasprashad, appearing pro se, filed the briefs for appellant.

Edward D. Alkalay, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: TATEL and GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this case, we consider whether a prisoner's transfer and reclassification in retaliation for exercising his First Amendment rights could, if proven, constitute "adverse determinations" under the Privacy Act. Answering yes and finding that the prisoner adequately alleges the other elements of a Privacy Act damages claim, we reverse the district court's dismissal and remand for further consideration.

I.

"Because we review here a decision granting [a] motion to dismiss, we must accept as true all of the factual allegations contained in the complaint[s]." *Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 995 n. 1, 152 L.Ed.2d 1 (2002). Viewed through that lens, the facts are as follows:

On September 22, 1997, the Bureau of Prisons transferred Appellant, Latchmie Toolasprashad, from the Federal Correctional Institution ("FCI") in Allenwood, Pennsylvania to the FCI in Marianna, Florida, and reclassified him as a "special offender." Compl. ¶ 13. According to Toolasprashad, the Bureau based both the transfer and the reclassification decisions on an internal Request for Redesignation, or transfer memorandum, written by several FCI–Allenwood staff members. The memorandum asserts that Toolasprashad had a "significant documented history of harassing and demeaning staff members" at FCI–Allenwood; that he failed "to program properly" there; and that he demonstrated "disruptive behavior" and "clearly disrupted the orderly running of [the] institution." *Id.* Ex. 2 at 1. Calling these assertions "fabricated and falsified," *id.* ¶ 4, Toolasprashad points to various Program Review Reports and work evaluations that, he argues, demonstrate he was a model prisoner during the events at issue here. For example, the Literacy Coordinator at FCI–Allenwood "commend[ed]" him "for his superior work performance ... as a GED and college tutor," observing that he "worked meritoriously without consideration of pay or rewards," and that he went "above and beyond his normal work to assist others." Pl.'s Mot., Aff. & Notice to Ct. Ex. 6 at 2. In addition, a Program Review Report indicates that he "programmed well, receiving good

evaluations and displaying positive motivation." Compl. Ex. 6 at 1.

According to Toolasprashad, the staff members' falsification of the transfer memorandum capped a series of incidents in which some of the same individuals "harass[ed]" and "intimidate[d] him," ridiculed his Hindu heritage, and engineered his dismissal from his job tutoring inmates in the Institution's education department. *Id.* ¶ 8; *see also* Am. Compl. ¶ 5; Pl.'s Mot., Aff. & Notice to Ct. Ex. 8 at 2 (alleging that prison "staff" called Toolasprashad "a 'rag head,' .'cow worshipper,' and 'sand nigger' "). In response to these incidents, Toolasprashad filed a series of administrative grievances and contacted public officials to complain about his treatment at FCI–Allenwood—actions he claims spurred the offending staff members to become even more abusive and to falsify the transfer memorandum on which the Bureau subsequently relied in transferring and reclassifying him.

Toolasprashad alleges that the transfer to FCI–Marianna and reclassification as a "special offender" adversely affected him in several ways. To begin with, he could no longer receive regular visits from his seriously ill parents, who live in Hollis, New York—a short drive from Allenwood but several days' drive from Marianna, Florida. In addition, he was denied parole, in part because the distance made it difficult for FCI–Allenwood "staff representatives" who would have testified on his behalf to "come to Marianna and represent [him] before the parole board." Compl. Ex. 3 at 4. Due to the stress of the transfer, moreover, Toolasprashad became severely depressed, had difficulty sleeping, and developed an eating disorder. Finally, as a "special offender," he became ineligible for certain jobs, including tutoring positions similar to those he had at FCI–Allenwood.

Invoking the Privacy Act, Toolasprashad filed suit in the United States District Court for the District of Columbia against the Bureau of Prisons and several named Bureau officials. Under the Act, an individual may "request amendment of a record pertaining to him," 5 U.S.C. § 552a(d)(2), and may obtain civil damages whenever an agency "intentional[ly] or willful[ly]" "fails to maintain any record concerning [the] individual with such accuracy ... as is necessary to assure fairness in any determination relating to ... the individual[,] ... and consequently a determination is made which is adverse to the individual," *id.* § 552a(g)(1)(C), (g)(4). In his original and amended complaints, Toolasprashad requested that the Bureau expunge the transfer memorandum from his prison file and sought damages from both the Bureau and individual staff members. The district court granted the Bureau's motion to dismiss on the grounds that (1) the transfer memorandum is located in the Inmate Central Record System, which the Bureau has "properly exempted" from the Privacy Act provision that permits requests for amendment of flawed records, *Toolasprashad v. Bureau of Prisons*, No. 99–2034, slip op. at 3 (D.D.C. June 20, 2000); (2) "the Privacy Act does not provide a cause of action against individual[ ]" defendants, *id.* at 2; and (3) Toolasprashad could not establish two necessary elements of his damages claim—that he was "aggrieved by an adverse [agency] determination" and that the agency acted "intentionally or willfully in failing to maintain accurate records," *id.* at 4–6 (citing *Deters v. United States Parole Comm'n*, 85 F.3d 655, 657 (D.C.Cir.1996)). After filing a motion for reconsideration, which the district court denied, Toolasprashad filed this appeal.

 In response to the Bureau's motion for summary affirmance, we affirmed the

district court's dismissal of Toolasprashad's claim for injunctive relief and his claims against the individual defendants. *See Toolasprashad v. Bureau of Prisons*, No. 00–5424 at 1 (D.C.Cir. July 17, 2001) (order granting partial summary affirmance). Observing that "[t]his court has not yet addressed whether the transfer of a prisoner in retaliation for the exercise of his constitutional rights could constitute an 'adverse determination' under the Privacy Act," however, we denied summary affirmance with respect to Toolasprashad's damages claim and appointed Professor Steven Goldblatt of the Georgetown University Law Center Appellate Litigation Program as amicus to present arguments with respect to this remaining issue. *Id.* at 1–2. We now consider the issue de novo. *E.g., Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C.Cir.2001).

## II.

▮▮▮ Before turning to the merits, we must address a procedural issue, flagged by amicus, that implicates our jurisdiction: the timeliness of the notice of appeal. Toolasprashad filed his notice almost five months after the district court entered judgment dismissing the original and amended complaints—well outside the sixty-day window permitted by Federal Rule of Appellate Procedure ("FRAP") 4(a)(1)(B). As amicus points out, however, Toolasprashad's situation is not nearly as dire as this suggests because seven days after the judgment of dismissal, he filed a motion entitled "Motion Requesting an Enlargement of Time to File a Motion and Brief for Reconsideration." Less than a month after the district court granted this first motion, Toolasprashad filed the promised motion for reconsideration, which the court denied. Because Toolasprashad filed his notice of appeal fewer than sixty days after the denial of his motion for reconsideration, the notice constituted a timely appeal from that denial.

The only procedural question, then, is whether Toolasprashad also timely appealed the district court's underlying dismissal. Two procedural rules govern this issue: FRAP 4, which provides that "the time to file an appeal runs ... from the entry of the order disposing" of a motion for relief from judgment under Federal Rule of Civil Procedure ("FRCP") 60 *"if the motion is filed no later than [ten] days ... after the judgment is entered,"* FED. R.APP. P. 4(a)(4)(A)(vi) (emphasis added); and FRCP 6, which provides that the district court "may not extend the time" for filing a FRCP 60 motion, FED.R.CIV.P. 6(b). As the latter rule makes clear, the district court lacked authority to grant Toolasprashad's motion for enlargement of time. Thus, if we strictly applied the rules, we could review only the district court's denial of reconsideration because Toolasprashad filed his motion for reconsideration outside FRAP 4's ten-day window, so his notice of appeal from the dismissal of his complaint was untimely.

Amicus suggests that we may avoid this procedural dilemma by construing the motion for enlargement of time itself as a FRCP 60 motion for relief from judgment, and the subsequent motion as a memorandum in support thereof. For several reasons, we think this approach makes sense. First, the former motion, which Toolasprashad filed within ten days of the original dismissal, expressly states, "[t]his case should not have been dismissed.... The Court erred as a matter of law that the defendants cannot subject prisoners to 're-taliation' by preparing fabricated and fictitious documents[,]" Pl.'s Mot. Req. Enlarg. Time at 1–2. This is virtually the same argument Toolasprashad later raised in his official motion for reconsideration. *See* Mot. Req. Recons. at 25–26 ("[P]laintiff could not be retaliated against by the [FCI–]Allenwood defendants for exercising his constitutional rights to petition the gov-

ernment for redress.... The evidence is clearly in favor of plaintiff that the defendants retaliated against plaintiff and the Court cannot ignore same."). In addition, we have an obligation to construe pro se filings liberally, *Richardson v. United States*, 193 F.3d 545, 548 (D.C.Cir.1999), particularly as in this case the procedural confusion arose in part because the district court overstepped its authority in granting an extension of time, *cf. Ruggiero v. FCC*, 278 F.3d 1323, 1328 (D.C.Cir.2002) (finding that liberal construction of filings "ma[de] particular sense" because appellant relied on this court's procedural order in failing to submit a second petition for review). Under this liberal construction, because Toolasprashad filed the motion for enlargement of time within the ten-day period established by FRAP 4, "the time to file [his] appeal r[an] ... from the entry of the order" denying reconsideration. FED. R.APP. P. 4(a)(4)(A)(vi). Accordingly, Toolasprashad timely appealed both the denial of reconsideration and the underlying dismissal, and both district court decisions are properly before us.

### III.

■■■ To state a claim for money damages under the Privacy Act, a plaintiff must assert that an agency failed to maintain accurate records, that it did so intentionally or willfully, and consequently, that an "adverse" "determination [wa]s made" respecting the plaintiff. 5 U.S.C. § 552a(g)(1)(C). That is, the plaintiff must allege: inaccurate records, agency intent, proximate causation, and an "adverse determination." Before turning to the "adverse determination" issue we asked amicus to brief, we consider whether Toolasprashad's original and amended complaints adequately allege the first three elements, keeping in mind "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■■■ In *Deters v. United States Parole Commission*, we explained that analysis of the inaccurate records element of a Privacy Act claim depends on whether the "truth" underlying the challenged statements "is clearly provable or relatively easily ascertainable." 85 F.3d at 658 (internal quotation marks and citation omitted). In "typical" cases, where truth can readily be ascertained, it is " 'feasible, necessary, and proper, for the agency and, in turn, the district court to determine whether each filed item of information is accurate.' " *Id.* (quoting *Doe v. United States*, 821 F.2d 694, 699 (D.C.Cir.1987) (en banc)). In contrast, in "atypical" cases, where truth is harder to determine, "neither the agency nor the court ... is required to 'find and record truth.' Instead, it suffices to 'adjust [the] file equitably to reveal actual uncertainty.' " *Id.* (quoting *Doe*, 821 F.2d at 701). Given the posture of this case—a motion to dismiss— we neither should nor need decide the typicality issue, however, as it turns on the kind and sufficiency of proof. For our purposes, it is enough that Toolasprashad challenges as false a specific assertion in the transfer memorandum that could, depending on the evidence, be easily ascertainable—namely, that he had a "significant *documented* history of harassing and demeaning staff members at [FCI–Allenwood]." Compl. Ex. 2 at 1 (emphasis added).

■■■ As for the issue of agency intent, we disagree with the district court that "the record would not support a finding that defendants acted willfully or intentionally." *Toolasprashad*, No. 99–2034, slip op. at 5. Toolasprashad alleges that

certain Bureau staff members "fabricated and falsified" the transfer memorandum to punish him for, among other things, filing administrative grievances. Compl. ¶ 4. If proven, retaliatory fabrication of prison records would certainly meet *Deters*' definition of a willful or intentional Privacy Act violation—a violation "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." 85 F.3d at 660. It makes no difference that other Bureau staff members, in deciding to transfer Toolasprashad, may "have reasonably relied on the memorandum." *Toolasprashad*, No. 99–2034, slip op. at 6. Reasonable reliance by some employees cannot immunize an agency from the Privacy Act consequences of employing other individuals who (allegedly) deliberately falsify records.

The third required element of a Privacy Act damages claim, causation, merits even less attention. The Bureau argues that Toolasprashad "fails to allege with any admissible evidence that the allegedly inaccurate Request for Redesignation was the proximate cause of his transfer." Appellees' Br. at 35. In its district court motion to dismiss, however, the Bureau stated just the opposite: "[P]laintiff was transferred based on the Request for Redesignation in his file." Def.'s Mem. Supp. Mot. to Dismiss at 7. The Bureau suggests no reason why it should not be held to its original characterization of the facts, at least for purposes of this appeal.

Having concluded that Toolasprashad adequately asserts the first three elements of a Privacy Act claim for damages, we turn to the central issue in this case: whether the Bureau's decisions to transfer and reclassify Toolasprashad in retaliation for his filing grievances could constitute "adverse determinations" under the Privacy Act. The Act provides little guidance as to the intended breadth of the phrase "determination . . . adverse to the individual." We have recognized, however, that in the prison context, "adverse determination" denotes, at least, a decision that negatively "affect[s] an] inmate's rights . . . ." *Deters*, 85 F.3d at 659. At this early stage in the proceedings, therefore, if Toolasprashad satisfactorily alleges deprivation of his constitutional rights, his claims must survive the Bureau's motion to dismiss. Indeed, at oral argument, the Bureau never disputed that, in the abstract, an allegation that an agency intentionally and willfully falsified a document to violate an individual's First Amendment rights would support a Privacy Act claim.

To determine whether Toolasprashad alleges a deprivation of rights, we consider two questions: Was he exercising his First Amendment rights when he filed the grievances? If so, was the Bureau's alleged response sufficiently severe to constitute actionable retaliation? The answer to the first question is undoubtedly yes. Prisoners, as the Supreme Court has held, retain their First Amendment "right to petition the Government for a redress of grievances." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (citing *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)). This right extends not just to court filings but also to the various preliminary filings necessary to exhaust administrative remedies prior to seeking judicial review. As the Fifth Circuit explained, "[a]ccess to courts entails not only freedom to file pleadings but also freedom to employ . . . those accessories without which legal claims cannot be effectively asserted." *Ruiz v. Estelle*, 679 F.2d 1115, 1153 (5th Cir.1982), *partially vacated on other grounds*, 688 F.2d 266, 267 (5th Cir.1982). Thus, although prison officials may limit inmates' ability to file administrative grievances provided the limitations are "reason-

ably related to legitimate penological interests," *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261, officials may not retaliate against prisoners for filing grievances that are "truthful[ ] and not otherwise offensive" to such interests, *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C.Cir.1996), *rev'd on other grounds*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). On remand, of course, the Bureau may offer any evidence tending to support its defense that it transferred Toolasprashad because his actions were indeed "offensive" to "legitimate penological interests."

The widely accepted standard for assessing whether "harassment for exercising the right of free speech [is] ... actionable"—our second question—depends on whether the harassment is "[ ]likely to deter a person of ordinary firmness from that exercise." *Crawford-El*, 93 F.3d at 826; *see also, e.g., Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir.2001) (citing this standard); *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989) ("Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs."). We think the allegedly retaliatory reclassification and transfer meet this standard.

To begin with, Toolasprashad claims that his reclassification as a "special offender" prevented him from obtaining tutoring jobs at FCI–Marianna akin to those at which he excelled at FCI–Allenwood, *see supra* at 580–81 (citing Toolasprashad's work evaluations from FCI–Allenwood). In addition, he alleges that his transfer to FCI–Marianna distanced him from his ill parents and from Bureau staff members who could have testified on his behalf at his parole hearing. If, as we held in *Crawford-El*, small "pecuniary losses ... in the form of the costs of shipping ... boxes and replacing clothing" are sufficient to "deter

a person of ordinary firmness ... from speaking again," 93 F.3d at 826, then surely Toolasprashad's alleged deprivations also meet this standard.

The Bureau offers several counter-arguments, none of which is convincing. For example, it notes that Toolasprashad's "ability to exercise his First Amendment rights has not been impaired by his transfer." Appellees' Br. at 24. This fact, though undisputed, is immaterial. The relevant question is not whether a transfer actually interferes with a particular prisoner's ability to exercise his rights but whether the threat of a transfer would, in the first instance, inhibit an ordinary person from speaking. *See Crawford-El*, 93 F.3d at 826. Equally irrelevant is the Bureau's long-recognized discretion to decide where to house prisoners. *See, e.g., Olim v. Wakinekona*, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983) (holding that inmates have no "justifiable expectation" of being "incarcerated in any particular prison"). "[A]n ordinarily permissible" exercise of discretion "may become a constitutional deprivation if performed in retaliation for the exercise of a [F]irst [A]mendment right." *Crawford-El*, 93 F.3d at 846 (Henderson, J., concurring). " 'Despite the fact that prisoners generally have no constitutionally-protected liberty interest in being held at, or remaining at, a given facility,' " therefore, the Bureau may not transfer an inmate "to a new prison in retaliation for exercising his or her First Amendment rights." *Vignolo v. Miller*, 120 F.3d 1075, 1077–78 (9th Cir.1997) (quoting *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.1995)). Finally, we are unpersuaded by the Bureau's argument that because the transfer memorandum was not binding, the document cannot form the basis of an "adverse determination" under the Privacy Act. The Bureau relies on a question posed in *Deters*: "If [a preliminary parole assessment] is not binding on

the hearing panel, can it really be deemed an 'adverse determination,' i.e., one affecting the inmate's rights ...?" 85 F.3d at 659. Here, though, because the Bureau transferred Toolasprashad in reliance on the transfer memorandum, *see supra* at 584, it cannot reasonably argue the memorandum had no effect on his rights.

Thus, in claiming retaliatory reclassification and transfer, Toolasprashad asserts deprivation of his First Amendment rights and, consequently, an "adverse determination" under the Privacy Act. We need not reach the more difficult question of whether reclassification or transfer would constitute an "adverse determination" in the absence of a First Amendment deprivation because the only claim before us that the Bureau acted intentionally or willfully—a prerequisite, as noted above, for a Privacy Act damages claim—relates to the staff members' alleged retaliation against Toolasprashad for exercising his First Amendment rights.

Overall, therefore, because Toolasprashad satisfactorily alleges inaccurate records, agency intent, proximate causation, and an "adverse determination"—the four required elements of a damages claim—his case survives the Bureau's motion to dismiss. Whether he can ultimately prevail is an issue for another day.

The judgment of the district court is reversed and this matter is remanded for further proceedings consistent with this opinion.

*So ordered.*