RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0286P (6th Cir.)
File Name: 02a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICKEY DOWNIE; DAVID
WHEAT,
            *Plaintiffs-Appellants,*

                                              No. 01-3051

            *v.*

CITY OF MIDDLEBURG
HEIGHTS, et al.,
            *Defendants,*

RICHARD P. SIEGEL; THOMAS
SCHNEIDER,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-01396—Lesley Brooks Wells, District Judge.

Argued: June 14, 2002

Decided and Filed: August 23, 2002

Before: SILER and MOORE, Circuit Judges; STAFFORD,
District Judge.[*]

_____

[*] The Honorable William H. Stafford, Jr., United States District Judge
for the Northern District of Florida, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:**    Kenneth D. Myers, FRIEDMAN & ASSOCIATES, Cleveland, Ohio, for Appellants. Dana J. Martin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Kenneth D. Myers, Avery S. Friedman, FRIEDMAN & ASSOCIATES, Cleveland, Ohio, for Appellants. Dana J. Martin, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

MOORE, J., delivered the opinion of the court, in which SILER, J., joined. STAFFORD, D. J. (pp. 22-27), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Mickey Downie ("Downie") appeals two orders of the district court dismissing his *Bivens* action against Defendants-Appellees Richard P. Siegel ("Siegel"), an agent of the United States Customs Service, and Thomas Schneider ("Schneider"), an agent of the United States Bureau of Alcohol, Tobacco, and Firearms ("ATF"). In 1998, Downie filed a complaint in federal district court against the City of Middleburg Heights, a number of state officials, and Siegel and Schneider, alleging various violations of his constitutional and statutory rights in connection with his resignation as an undercover informant for the United States Customs Service. Essentially, Downie claimed that Siegel retaliated against him for comments he made in his resignation letter by creating, maintaining, and then disseminating, to Schneider and the state officials, a "blackball" memo falsely stating that Downie was not a reliable informant.

asserted three different legal theories and asked for two different types of damages. The appellate court accordingly dismissed the appeal and remanded the case to the district court for further proceedings.

The court in *General Acquisition* did not address the aspect of a Rule 54(b) issue that is before this court: that is, whether the district court complied with the rule's technical requirements. Presumably, the district court's certification in *General Acquisition* contained the required "express determination" and "express direction" components. Nonetheless, in the context of the separable claim issue, the *General Acquisition* court wrote: "The first step in certification, entry of partial final judgment, is satisfied where some decision made by the district court ultimately disposes of one or more but fewer than all of the claims or parties in a multi-claim/multi-party action." *Gen. Acquisition*, 23 F.3d at 1026-1027.

Here, in the context of an "express direction" issue, *not* in the context of separable claims issue, the majority quotes the above sentence in *General Acquisition*, suggesting that the "express direction" component of Rule 54(b) is satisfied when *"some decision* made by the district court ultimately disposes of one or more but fewer than all of the claims or parties." *Supra* p.8 (emphasis supplied by majority). In my opinion, the majority has taken the language from *General Acquisition* out of context and, by doing so, has undermined Rule 54(b)'s direction that "any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties" *if* the district court has failed to comply with either the "express direction" or "express determination" component of Rule 54(b).

C.

Even though jurisdiction lies in this court whether or not the district court satisfied the technical requirements of Rule 54(b), the majority decides that, in fact, the district court's September 12th "Judgment Entry", combined with its December 11th order expressly determining that there was no just reason for delay, satisfied those requirements. The majority thus decides that the required "express determination that there is no just reason for delay" and the required "express direction for the entry of judgment" need not be included in the same court order but can, instead, be parsed from two separate documents entered months apart. Because I think the majority's decision could undermine the certainty which is the very aim of Rule 54(b),[4] I would not make such a decision where, as in this case, the decision is unnecessary to a finding of jurisdiction.

Moreover, I question the majority's reliance on a sentence taken from *General Acquisition, Inc. v. GenCORP., Inc.*, 23 F.3d 1022, 1026,1027 (6th Cir. 1994). In that case, this court considered whether the "judgment" certified for appeal--a judgment on the damages element, but not the liability element, of the plaintiff's case--ultimately disposed of a separable claim. On review, this court determined that the district court was "powerless" to certify its order regarding damages. Because the plaintiff's allegations concerned a single aggregate of operative facts, the circuit court found that separable claims were not present even though the plaintiff

---

begun to run and have behaved accordingly. *Id.*

[4]In this case, for example, Downie might have wondered whether a "judgment" that was a nullity when entered could later serve as the express entry of judgment triggering the time for appeal under Rule 54(b). Had he assumed that the "Judgment Entry," which was ineffective when entered in September, could *not* be resurrected as a valid entry of judgment in December, he might have delayed filing his appeal, waiting for entry of another judgment.

The United States substituted itself for Siegel and Schneider, as federal employees acting in the scope of their employment, for all the claims in Downie's complaint except those claims alleging constitutional violations. Siegel and Schneider then moved to dismiss Downie's constitutional claims against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Concluding that Downie could not seek relief against the defendants under *Bivens* because Congress had enacted an elaborate remedial scheme in the Privacy Act of 1974 to address claims regarding the creation, maintenance, and dissemination of false records by federal agency employees, the district court in two orders fully granted the defendants' motion to dismiss. Downie now appeals the district court's dismissal of his constitutional claims against Siegel and Schneider. For the following reasons, we **AFFIRM** the orders of the district court.

## I. BACKGROUND

On June 17, 1998, Mickey Downie and David Wheat ("Wheat") filed a complaint in the United States District Court for the Northern District of Ohio against the City of Middleburg Heights, Middleburg Heights Police Officer Glenn Blatnica, Ashtabula County Prosecutor Thomas Sartini, Cuyahoga County Chief Assistant Prosecutor Carmen Marino, U.S. Customs Service Agent Richard Siegel, ATF Agent Thomas Schneider, and federal and state law enforcement officers "John Does 1-10." Joint Appendix ("J.A.") at 12-13 (Compl.). The complaint alleged that Downie worked as an "undercover operative" for the U.S. Customs Service in 1990, "identifying several major U.S. corporations that were funneling millions of dollars to Communist governments of Vietnam and China in violation of federal law" for an undercover operation of the U.S. Treasury Department known as "Operation Leatherneck."

J.A. at 17 (Compl. ¶¶ 16-18).[1] In June 1990, Downie claimed that he resigned as an "undercover operative" over disagreements between Downie and U.S. Customs officials as to decisions made in connection with "Operation Leatherneck." Downie's letter of resignation stated, inter alia, that:

> I find it disconcerting that despite the overall success of this project, as well as my consistent referrals of documented intelligence to your office for the last six years, my identity would be compromised by you (if not for the ongoing gun case) to prosecute one more defendant for one count of trafficking counterfeit Gucci bags. For this reason I am giving serious consideration to referring the instant case to the FBI to investigate the nexus among the Ohio based violator, his brother who is an aide to a U.S. Congressman and this Congressman's possible contacts with one of the Florida based conspirators.

J.A. at 36 (Letter of Resignation, Ex. A to Compl.). Following his resignation, Downie claims that Siegel "began a campaign to discredit [him]." J.A. at 18 (Compl. ¶ 22).

Siegel's alleged campaign to discredit Downie consisted of three parts. First, Downie claims that Siegel wrote a "blackball" memo regarding Downie, which Siegel sent to the director of the Office of Domestic Operations for the U.S. Customs Service and which stated in its entirety:

> In accordance with chapter 41 of the Special Agent Handbook this office recommends that Mickey Downey . . . be prohibited (blacklisted) from any further participation as a source of information for the Customs

---

[1] We note that all parties to this appeal agree that Downie was not an employee of the U.S. Customs Service. Appellant's Br. at 25; Appellees' Br. at 34; *see also* 5 U.S.C. § 2105(a) (defining "employee" for the purposes of the Civil Service Reform Act ("CSRA")).

liabilities of all the parties." Fed. R. Civ. P. 54(b). In effect, the "Judgment Entry" was a nullity.

On October 18, 2000, presumably recognizing that the district court's "Judgment Entry" did not terminate the action as to Siegel and Schneider and that it did not start the appeal clock running, Downie filed a Rule 54(b) motion for permission to file an immediate appeal. On December 11, 2000, the district court entered an order granting Downie's Rule 54(b) motion, gave its reasons for finding that there was no just cause for delay, but did not expressly direct entry of judgment. J.A. at 298. Downie filed his notice of appeal on January 9, 2001. J.A. at 46.

Whether or not the district court satisfied the technical requirements of Rule 54(b), in particular the requirement of an "express direction for the entry of judgment," appellate jurisdiction properly rests in this court. Clearly, the case involves multiple parties. Just as clearly, the district court wholly resolved the action as to two of those parties--Siegel and Schneider--when it granted their motion to dismiss. Substantively, therefore, the district court had a proper basis for certifying an immediate appeal. Downie, moreover, assumed that the time for appeal began to run when the district court granted his Rule 54(b) motion, and he filed a timely notice of appeal accordingly. Under these circumstances, even *if* the district court failed to comply with the technical requirements of Rule 54(b), no purpose would be served by sending the case back to the district court for a "proper" certification.[3]

---

[3] Like Rule 54(b), Rule 58 addresses a concern for an express and unmistakable determination of finality; yet the United States Supreme Court has said that an appellate court should insist on technical application of Rule 58 only when technical application of the rule would prevent the loss of a litigant's right to appeal due to confusion. *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 385, 98 S. Ct. 1117, 55 L. Ed. 2d 357 (1978). In contrast, compliance with the technicalities of Rule 58 is unnecessary when the parties have assumed that the time for appeal has

§ 2654 at 36 (3d ed. 1998) (internal quotation omitted); *see also In re Frederick Petroleum*, 912 F.2d 850, 853-854 (6th Cir. 1990) (suggesting that Rule 54(b) "establishes a much-needed, bright-line test for determining finality, providing certainty for litigants as to whether their appeals are final"). Without strict compliance with the rule's technical requirements, litigants may be left to wonder whether and when the clock starts to run for an appeal of a partial judgment.

That a district court complies with the technical requirements of Rule 54(b) does not necessarily mean that an appeal of a certified partial judgment is proper. By its own terms, Rule 54(b) applies only to actions involving either multiple parties or multiple claims. Accordingly, an appellate court must examine not only a district court's compliance with the rule's "express determination" and "express direction" requirements; it must also look behind the district court's certification order to determine whether, substantively, the question certified for appeal satisfies the multiple claims/multiple parties prerequisite.

### B.

In this case, on September 12, 2000, the district court entered an order granting Siegel's and Schneider's motion to dismiss. J.A. at 39. That same date, the district court signed what is entitled a "Judgment Entry" in favor of Siegel and Schneider, and that "Judgment Entry" was entered on the docket.[2] Because the court did not, at that time, expressly determine that there was no just reason to delay an appeal, the "Judgment Entry" did not "terminate the action as to any of the claims or parties, and the order or other form of decision [wa]s subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and

---

[2]The district court's "Judgment Entry" was not included in the appendix to this case.

Service. This source has proven to be both undesirable and unreliable. He reneged on a promise to testify at the conclusion of an undercover investigation, refused to take direction of his control agent and other supervisory agents regarding his activities in an undercover investigation and revealed proprietary Customs information regarding a sensitive undercover investigation to other law enforcement agencies and parties unknown without the permission of the Customs Service. His actions compromised more than one investigation causing possible danger to an undercover Customs Special Agent and the dismissal of criminal charges against at least one defendant. . . . For the above reasons, it is my belief that the individual should no longer be used as an informant by the Customs Service.

J.A. at 37 (Siegel Memo, Ex. B to Compl.). Second, Downie claims that Siegel "enlisted the assistance" of Schneider, and, together, they caused Downie's federal firearms license to be revoked, illegally seized Downie's firearm, and caused the entry of false records into the City of Middleburg Heights police files regarding an arrest of Downie for carrying a concealed weapon. J.A. at 19-20 (Compl. ¶¶ 29-33). Third, Downie claims that "various federal officials" caused him and his assistant, Wheat, to be fired from positions with the Ashtabula County Narcotics Task Force. J.A. at 23-24 (Compl. ¶¶ 54-61). According to Downie, he was hired to be "director" of the Ashtabula County Narcotics Task Force by defendant Thomas Sartini, the Ashtabula County Prosecutor. Downie contends that, after hiring him, Sartini was contacted by various federal officials and warned that if he did not fire Downie, the federal officials would no longer work with Sartini. The federal officials purportedly told Sartini that Downie was "undesirable and unreliable," the exact words used in the "blackball" memo. J.A. at 23 (Compl. ¶ 56).

On the basis of the above facts, Downie and Wheat alleged in the complaint that: (1) the defendants retaliated against them in violation of their First Amendment rights; (2) the

defendants violated their rights under Ohio law; and (3) the defendants conspired to deprive them of their constitutional and state-law rights. Along with the complaint, Downie and Wheat filed a motion for a temporary restraining order and a preliminary injunction, but after a hearing on July 9, 1998, the district court denied the motion. On November 2, 1998, the United States substituted itself for defendants Siegel and Schneider pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), codified at 28 U.S.C. § 2679.[2] The substitution covered all the claims alleged in the plaintiffs' complaint, except those alleging violations of the United States Constitution. *See* 28 U.S.C. § 2679(b)(2)(A). The United States then filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Also on November 2, 1998, Siegel and Schneider filed a motion to dismiss for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

On September 30, 1999, the district issued an order granting the government's motion to dismiss, and granting in part Siegel's and Schneider's motion to dismiss. *See Downie v. City of Middleburg Heights*, 76 F. Supp. 2d 794 (N.D. Ohio 1999). In regard to the government's motion, the district court explained that the United States can only be sued pursuant to the Federal Tort Claims Act ("FTCA"). Because Downie and Wheat did not allege in their complaint that they had exhausted their administrative remedies as required by the Act, 28 U.S.C. § 2675(a), and because all of their state law claims fell under exceptions to the United States's general waiver of sovereign immunity, 28 U.S.C. § 2680(h), the

---

[2]The United States may substitute itself as the party defendant in civil suits against federal employees "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1).

requirements is apparent not only from their use of different terminology--the words "determination" and "direction"--to describe the two requirements but also from their use of the word "express" to modify each of the two requirements.[1]

The second sentence explains the effect of a district court's failure to comply with the "determination" and "direction" requirements. Indeed, in the second sentence, the drafters underscored the importance of the "determination" and "direction" requirements by providing that *any* court order, however designated, that does not comply with both the "determination" and "direction" requirements "shall not terminate the action as to any of the claims or parties" and shall be subject to later revision. Fed.R.Civ.P. 54(b). Moreover, inclusion of the words "however designated" signals the drafters' concern that the requirements not be circumvented.

By including the "express determination" and "express direction" requirements, the drafters of Rule 54(b) addressed "an overriding concern for certainty and for an express and unmistakable determination of finality in ambiguous multi-party and multi-claim situations." *FSLIC v. Tullos-Pierremont*, 894 F.2d 1469, 1475 (5th Cir. 1990). As Professor Wright states: "[Rule 54(b)] provides much-needed certainty in determining when a final and appealable judgment has been entered....[I]f [the court] does choose to enter such a final order, [the court] must do so in a definite, unmistakable manner." 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*

---

[1]Black's Law Dictionary defines "express" as "[c]learly and unmistakably communicated." *Black's Law Dictionary* 601 (7th ed.1999). Other dictionaries give substantially similar definitions. *See, e.g., Webster's Third New International Dictionary* 803 (1993) (defining "express" as "directly and distinctly stated or expressed rather than implied or left to inference ... definite, clear, explicit, unmistakable"); *The Merriam Webster Dictionary* 182 (1995)(defining "express" as "explicit; exact, precise...specific").

_____

**CONCURRENCE**

_____

WILLIAM STAFFORD, District Judge, specially concurring. The majority concludes in Part II that the district court's certification satisfied the "express determination" and "express direction" requirements of Rule 54(b). Because I find such conclusion both problematic and unnecessary to the decision here, I write separately to explain why I think appellate jurisdiction exists in this case.

A.

Rule 54(b) states, in relevant part:

When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed. R. Civ. P. 54(b) (2002). The first sentence of the rule explains what a district court must do to enter a partial final judgment. Specifically, the court must make both an "express determination that there is no just reason for delay" and an "express direction for the entry of judgment." Fed.R.Civ.P. 54(b). That the drafters intended two separate and distinct

district court granted the government's motion to dismiss for lack of subject matter jurisdiction.

In regard to Siegel's and Schneider's motion to dismiss, the district court first concluded that Wheat's complaint against Siegel and Schneider failed to state a claim upon which relief could be granted because the complaint did not allege that Siegel and Schneider violated Wheat's constitutional rights. The court next concluded that Count III of the complaint, in which Downie alleged that he had been retaliated against for his "prior use of the legal system," also failed to state a claim upon which relief could be granted because the complaint did not allege that Siegel and Schneider blocked Downie's access to the courts. Finally, the district court concluded that Counts I, II, and XI of Downie's complaint failed to state a claim upon which relief could be granted insofar as they relied on the U.S. Customs Service's retention or dissemination of the "blackball" memo. The district court agreed with Siegel and Schneider that Downie could not seek a *Bivens* remedy against them for the retention or dissemination of the memo because the Privacy Act of 1974 existed as a comprehensive legislative scheme providing a meaningful remedy against the United States for such retention and dissemination. To the extent that Counts I, II, and XI of Downie's complaint did not rely on the retention or dissemination of the memo, the district court denied Siegel's and Schneider's motion to dismiss, finding also that they were not entitled to qualified immunity.

On October 14, 1999, Siegel and Schneider moved for reconsideration of the district court's partial denial of their motion to dismiss. Siegel and Schneider argued that the Privacy Act entirely precluded Downie's First Amendment retaliation claims against them. On September 12, 2000, the district court issued an order granting the motion for reconsideration and amending its order of September 30, 1999 to dismiss all of Downie's claims against Siegel and Schneider pursuant to Federal Rule of Civil Procedure 59(e); on the same day, the court entered judgment for Siegel and

Schneider.  The court concluded that the Privacy Act of 1974 also existed as a comprehensive legislative scheme providing a meaningful remedy against the United States for the creation of the "blackball" memo, and the court then further held that the effect of its conclusion regarding the creation of the memo was "dispositive of the rest of the claims against Siegel and Schneider." J.A. at 42 (Sept. 12, 2000 Order Granting Defs.' Mot. for Recons.).  Following the district court's certification under Federal Rule of Civil Procedure 54(b), Downie and Wheat filed a notice of appeal regarding the district court's dismissal of their claims against Siegel and Schneider.[3]

## II.  JURISDICTION

Siegel and Schneider contend that this court lacks jurisdiction to hear Downie's appeal because the district court did not properly certify for appeal its dismissal of Downie's constitutional claims against them.  We disagree.  Following its dismissal of Downie's constitutional claims against Siegel and Schneider in two orders, the district court granted Downie's motion to appeal those orders pursuant to Federal Rule of Civil Procedure 54(b).  Under Rule 54(b), a party may appeal a district court order prior to the ultimate disposition of a case,[4] but the district court is first required to certify that the order is appealable.  *See EEOC v. Northwest Airlines, Inc.*, 188 F.3d 695, 700 (6th Cir. 1999).  To certify an order for immediate appeal, a district court must:  (1) "expressly

---

[3] Although the notice of appeal states that Downie and Wheat appeal the district court's decision, Downie states in his brief on appeal that the appeal "is on behalf of plaintiff Downie only."  Appellant's Br. at 4.

[4] Federal Rule of Civil Procedure 54(b) provides in pertinent part: When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

comprehensive legislative scheme that provides a meaningful remedy, precludes Downie's *Bivens* action against Siegel and Schneider on Count III of his complaint.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the orders of the district court dismissing Downie's constitutional claims against Siegel and Schneider.

## C.  Count III

The district court dismissed Count III of Downie's complaint on the ground that "[t]he Count raises a retaliation claim . . . but that claim rests on the premise that the defendants' retaliatory actions violated Downie's right of access to the courts.  Nowhere in the complaint, however, does Downie suggest how the defendants might have blocked his access to the courts . . . ."  *Downie*, 76 F. Supp. 2d at 802.  Count III of Downie's complaint alleged:

> The actions of the defendants, in publishing false and defamatory information about plaintiffs, constitutes [sic] a violation of plaintiffs' First Amendment right of access to the courts, in that the actions of the defendants is [sic] in retaliation for plaintiff Downie's prior use of the legal system to vindicate his rights.

J.A. at 27 (Compl. ¶ 76).  Downie now argues that in this count he was alleging not that the defendants prevented him from accessing the courts, but "that some of the adverse actions taken against him were in retaliation for him having asserted his legal rights through the courts."  Appellant's Br. at 16.

Downie's interpretation of Count III is plausible.  However, we nonetheless conclude that the district court properly dismissed Count III.  As we explained above, the only "false and defamatory" information at issue in this case are the false records that Siegel and Schneider allegedly created, maintained, and disseminated.[13]  Therefore, the same analysis that applied to Counts I, II, and XI of Downie's complaint applies to Count III; we hold that the Privacy Act, as a

---

[13]As Siegel and Schneider note, Downie cannot intend Count III to apply to the first two parts of Siegel's alleged "campaign to discredit" him – the creation and maintenance of false records.  The "blackball memo" was written in 1991 and the firearms revocation occurred in 1993, but Downie did not file any action in the courts until 1995.

direct the entry of final judgment as to one or more but fewer than all the claims or parties in a case"; and (2) "express[ly] determin[e] that there is no just reason to delay appellate review."  *Gen. Acquisition, Inc. v. GenCorp., Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994) (quotations omitted).  Siegel and Schneider argue that in its order certifying Downie's immediate appeal on December 11, 2000, the district court did not "expressly direct entry of final judgment for the federal defendants."  Appellees' Br. at 2.  "Instead the court simply referred to its entry of judgment of September 12, 2000."  Appellees' Br. at 2.  According to Siegel and Schneider, this "procedural anomaly" creates a situation in which the plaintiff's certified notice of appeal is untimely because it was filed more than sixty days after the entry of the district court's September 12, 2000 order.  *See* Fed. R. App. P. 4(a)(1)(B).

We have held, however, that "[t]he first step in certification, entry of partial final judgment, is satisfied where *some decision* made by the district court ultimately disposes of one or more but fewer than all of the claims or parties in a multi-claim/multi-party action."  *Gen. Acquisition*, 23 F.3d at 1026-1027 (emphasis added).  The district court need not *enter* the partial final judgment in its certification of an immediate appeal pursuant to Rule 54(b); it simply must *recognize* that such a partial final judgment has been entered.  In its certification of Downie's appeal regarding the dismissal of his claims against Siegel and Schneider, the district court recognized that its express entry of judgment for Siegel and Schneider on September 12, 2000 finally disposed of all Downie's claims against Siegel and Schneider.  This is sufficient for certification purposes, and, therefore, Downie properly and timely filed his notice of appeal from the district court's order granting Rule 54(b) certification.

## III. ANALYSIS

### A. Standard of Review

This court reviews de novo a district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Pfennig v. Household Credit Servs., Inc.*, 286 F.3d 340, 343 (6th Cir. 2002). In reviewing a Rule 12(b)(6) motion to dismiss, this court treats all well-pleaded allegations in the complaint as true, and the court finds dismissal proper only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Id*. (quotation omitted).

### B. *Bivens* Action — Privacy Act

The district court concluded that the Privacy Act of 1974 precluded all of Downie's *Bivens* claims against Siegel and Schneider. Downie contends on appeal that the district court erred in so concluding.[5] In *Bivens*, the Supreme Court recognized in the United States Constitution itself an implicit damages cause of action against individual federal officials for violations of constitutional rights. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); *see also Jones v. TVA*, 948 F.2d 258, 262 (6th Cir. 1991). However, the Supreme Court has also held that a *Bivens* remedy will not be implied where: (1) there are "'special factors counselling hesitation in the absence of affirmative action by Congress'"; or (2) "Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the constitution and

---

[5]We note that Downie also alleges on appeal that his *Bivens* action should be assessed differently as it relates to Siegel and Schneider and that his claims against both Siegel and Schneider should be addressed under 42 U.S.C. § 1983. As Siegel and Schneider point out, Downie did not raise these claims in the district court, and he has therefore waived our consideration of them. *See Blakely v. United States*, 276 F.3d 853, 866 n.5 (6th Cir. 2002).

---

F.Supp. 578, 585-88 (E.D. Va. 1995); *Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 454 (D.D.C. 1991); *Patterson v. FBI*, 705 F. Supp. 1033, 1045 n.16 (D.N.J. 1989), *aff'd*, 893 F.2d 595 (3d Cir.), *and cert. denied*, 498 U.S. 812 (1990); *see also Khalfani v. Sec'y, Dep't of Veterans Affairs*, 1999 WL 138247, at *7 (E.D.N.Y. March 10, 1999); *cf. Alexander v. FBI*, 971 F. Supp 603, 610 (D.D.C. 1997) (Privacy Act did not preclude *Bivens* action against federal officials acting outside the scope of their employment). In particular, in *Mittleman*, a former employee of the U.S. Treasury alleged that she had been fired in retaliation for "whistle blowing," and that false information contained in the department's files involving the incident prevented her from obtaining future employment. *Mittleman*, 773 F.Supp. at 445-48.[12]

In sum, although few other federal courts have ruled on this issue, we conclude that the Privacy Act of 1974 is a comprehensive legislative scheme that provides a meaningful remedy for the wrong Downie alleges, and we therefore will not imply a *Bivens* damages remedy for Downie against Siegel and Schneider on Counts I, II, and XI of his complaint.

---

[12]Downie also argues that in at least one case a federal court has permitted a plaintiff to seek *Bivens* relief in circumstances similar to his. In *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994), the plaintiff brought a *Bivens* action against federal officials, alleging that she had been fired from her job with an independent contractor working for the State Department on the basis of the Department's security concerns in violation of her Fifth Amendment due process rights. *Id.* at 1526. As evidence of the causal link between the firing and the Department, the plaintiff presented Department memos discussing her as a security concern. *Id.* Although *Kartseva* seems similar in some respects to the instant case, we find it distinguishable for two reasons. First, the fact pattern is different from the instant case in that Kartseva did not appear specifically to allege that the Department's memos were false, but simply that they functionally disqualified her from future employment without due process. *Id.* at 1528-29. Second, the D.C. Circuit in *Kartseva* did not address whether the Privacy Act would preclude the plaintiff's *Bivens* action.

determination' under the Privacy Act."[10]  *Id*. at 584, 586. Although we need not explicitly adopt the reasoning of the D.C. Circuit in *Toolasprashad* at this time, we note that we find that court's reasoning persuasive regarding the interpretation of "intentional or willful" in the damages provision of the Privacy Act to include First Amendment retaliation.[11]

Finally, Downie points out that only a handful of courts have held that the Privacy Act exists as a comprehensive legislative scheme providing a meaningful remedy to prevent persons such as himself from bringing *Bivens* actions against individual federal officials who falsify records in retaliation for the exercise of First Amendment rights. It does appear that no circuit court has addressed this question, but, as Siegel and Schneider note, a number of district courts have addressed the question, and they have all held that the Privacy Act does prevent persons such as Downie from bringing *Bivens* actions against individual federal officials. *See Sullivan v. U.S. Postal Serv.*, 944 F. Supp. 191, 195 (W.D.N.Y. 1996); *Williams v. Dep't of Veteran Affairs*, 879

---

[10]In its test for an adverse determination, the D.C. Circuit applied the standard that we use in First Amendment retaliation cases. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

[11]In his brief on appeal, Downie argues that his Fifth Amendment due process rights were also violated by the defendants' action: "appellant has sufficiently plead a denial of his right to seek employment in his chosen profession, and the labeling of it as a violation of the First Amendment rather than the Fifth Amendment should be of no consequence in terms of the court's determination that a *Bivens* suit is appropriate." Appellant's Br. at 33. However, claims alleging violations of due process are different than claims alleging retaliation in violation of the First Amendment; Downie does *mention* employment in Count I of his complaint, but he nowhere argues that the defendants adversely affected his employment status without *due process*. Therefore, this argument is a new claim, and, as Downie did not raise this claim in the district court, we will not address on appeal. *See infra* note 5; *Blakely*, 276 F.3d at 866 n.5.

viewed as equally effective." *Jones*, 948 F.2d at 262 (quoting *Bivens*, 403 U.S. at 396-97).

In two cases in the 1980s, the Supreme Court further delineated the two exceptions to the *Bivens* doctrine. In *Bush v. Lucas*, the Supreme Court held that a NASA aerospace engineer could not bring a *Bivens* action against his employer for retaliatory demotion in violation of the First Amendment: "Because such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, we conclude that it would be inappropriate for us to supplement that regulatory scheme with a new judicial remedy." *Bush v. Lucas*, 462 U.S. 367, 368 (1983). The *Bush* Court explained that, "[w]hen Congress provides an alternative remedy, it may, of course, indicate its intent, by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the Court's power should not be exercised." *Id*. at 378. However, "[i]n the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed . . . to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id*. The fact that Congress constructed an "elaborate remedial system" for addressing violations of federal employees' rights — including violations of their First Amendment rights — constituted a special factor sufficient for the Court to refuse to imply a *Bivens* remedy. *Id*. at 388-89.

In *Schweiker v. Chilicky*, the Court held that individuals alleging that their social security benefits had been terminated in violation of their due process rights could not bring *Bivens* actions against federal social security administrators. *Schweiker v. Chilicky*, 487 U.S. 412 (1988). Because a damages remedy was not "included in the elaborate remedial scheme devised by Congress," it was unavailable. *Id*. at 414. According to the Court:

[T]he concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id*. at 423. Although the Court conceded that "[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed," the Court concluded that "Congress . . . has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were." *Id*. at 425.

In *Jones*, this court held that a TVA employee could not bring a *Bivens* action against TVA officials for violations of his First and Fifth Amendment rights. *Jones*, 948 F.2d at 264. We noted that "[s]ince *Schweiker*, courts in several instances have limited their inquiry to whether Congress has enacted a comprehensive administrative scheme governing the area involved, which indicates that Congress' failure to provide a damages remedy for constitutional violations was deliberate rather than inadvertent." *Id*. (citations omitted). We then stated that "[i]n the field of federal employment, even if no remedy at all has been provided by the [Civil Service Reform Act ("CSRA")], courts will not create a *Bivens* remedy." *Id*. Because Jones was provided some relief under both the CSRA and the Energy Reorganization Act ("ERA"), we concluded that "[t]he fact that . . . Congress has denied him coverage for other kinds of personnel actions is not a ground for implying judicial relief, but rather a ground for denying judicial relief." *Id*.

Additionally, in *Fishburn v. Brown*, we held that a taxpayer could not bring a *Bivens* action against IRS agents for

---

constitutional rights in retaliation for blowing the whistle on corrupt governmental conduct." Appellant's Br. at 26. While the Privacy Act does not provide a *separate* damages remedy for the intentional or willful creation, maintenance, or dissemination of false records in retaliation for an individual's First Amendment rights, we believe that retaliation on any basis clearly constitutes intentional or willful action. In fact, the D.C. Circuit recently held that "intentional or willful" action for the purposes of the Privacy Act does comprehend First Amendment retaliation. *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 586 (D.C. Cir. 2002).[8] Toolasprashad, a federal prisoner, alleged that he had been transferred and reclassified as a "special offender" on the basis of a falsified transfer memorandum prepared in retaliation for his exercise of his First Amendment rights. The D.C. Circuit explained that in order for a plaintiff to state a claim for money damages under the Privacy Act, the plaintiff must assert: "inaccurate records, agency intent, proximate causation, and an 'adverse determination.'" *Id*. at 583. The court then concluded that "retaliatory fabrication of prison records would certainly meet [our] definition of a willful or intentional Privacy Act violation,"[9] and "in claiming retaliatory reclassification and transfer, Toolasprashad asserts deprivation of his First Amendment rights and, consequently, an 'adverse

---

[8]We note that the Privacy Act itself supports this conclusion in that the Act explicitly recognizes that the damages provision may be used to vindicate at least one kind of violation of an individual's First Amendment rights. *See* 5 U.S.C. § 552a(e)(7).

[9]The court also noted in regard to the willfulness and intent of the defendants that "[i]t makes no difference that other Bureau staff members, in deciding to transfer Toolasprashad, may have reasonably relied on the memorandum. Reasonable reliance by some employees cannot immunize an agency from the Privacy Act consequences of employing other individuals who (allegedly) deliberately falsify records." *Toolasprashad*, 286 F.3d at 584 (quotation omitted).

regulates the collection, maintenance, use, and dissemination of information concerning individuals." (quotation omitted)). Although Counts I and XI generally refer to "actions" or "acts" by the defendants, all three parts of Siegel's alleged "campaign to discredit" Downie, as described in Downie's complaint, involved the creation, maintenance, or dissemination of false records on Downie. Moreover, at oral argument, Downie's counsel conceded that Downie's complaint really only involved the creation, maintenance, and dissemination of false records.

On its face, then, Downie's complaint appears only to involve a wrong — the intentional and willful creation, maintenance, and dissemination of false records by federal agency employees — for which Congress has already provided a meaningful remedy. Downie contends, however, that "Congress did not explicitly declare the Privacy Act to be a substitute for an action directly under the Constitution." Appellant's Br. at 23. It is true that Congress did not explicitly declare the Privacy Act to be either a substitute for an action directly under the Constitution or an exclusive remedy. However, the *Bush* and *Schweiker* test for "special factors counselling hesitation in the absence of affirmative action by Congress," does not require either that Congress explicitly declare an "elaborate remedial scheme" to be an adequate alternative remedy to a *Bivens* remedy or that the "elaborate remedial scheme" declare itself to be an exclusive remedy. We believe that, in this case, the fact that the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy for the wrong that Downie alleges is sufficient as a "special factor[] counselling hesitation" for us to refuse to imply a separate damages remedy under *Bivens*.

Downie also contends that although the Privacy Act provides a damages remedy for the "intentional or willful" creation, maintenance, or dissemination of false records, 5 U.S.C. § 552a(g)(4), it does not provide a damages remedy for "willful and intentional conduct that is done specifically and intentionally for the purpose of violating one's

violations of her Fourth Amendment rights. *Fishburn v. Brown*, 125 F.3d 979, 983 (6th Cir. 1997). We stated that "Congress has provided a damages remedy for the reckless or intentional disregard of Internal Revenue Code Provisions by IRS employees in collecting taxes. Furthermore, Congress unequivocally stated that [such provision] is the exclusive remedy for recovering damages resulting from such actions." *Id*. at 982 (citations and quotation omitted). Although the damages provision does not mention constitutional violations, we noted that "[t]hese carefully crafted legislative remedies confirm that, in the politically sensitive realm of taxation, Congress's refusal to permit unrestricted damage actions by taxpayers has not been inadvertent." *Id*. at 983 (quotation omitted).

The district court concluded in this case that the Privacy Act "directly addresses and regulates the conduct surrounding the 'blackball' memo of which Downie complains." *Downie*, 76 F. Supp. 2d at 802. In the district court's order of September 30, 1999, in which it granted in part the defendants' motion to dismiss, the court held only that the Privacy Act precluded Downie's *Bivens* action as to the maintenance and dissemination of the memo. However, in its order of September 12, 2000, in which it granted the defendants' motion to reconsider, the court held that the Privacy Act precluded Downie's *Bivens* action as to the creation of the memo as well. The Privacy Act provides that:

> Whenever any agency . . . fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, . . . the individual may

bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1)(C) & (D).  The Act defines "maintain" as including "maintain, collect, use, or disseminate," and "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency, including . . . [his] employment history."  5 U.S.C. § 552a(a)(3) & (4).  In addition, the Act provides that "[e]ach agency that maintains a system of records shall — . . . maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7).  Finally, the Act provides a damages remedy:

> In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of —
> (A)  actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recover receive less than the sum of $1,000; and
> (B)  the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4).[6]

We agree with the district court that because the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy for the kind of wrong Downie alleges that

---

[6]The term "agency" for the purposes of the Act includes executive departments.  *See Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001).  Both the U.S. Customs Service and the ATF are thus agencies.

he suffered, we should not imply a *Bivens* remedy for Downie against Siegel and Schneider directly under the First Amendment of the United States Constitution.[7]  Counts I, II, and XI of Downie's and Wheat's complaint allege as follows:

> Count I:  Plaintiffs are entitled to seek employment in their chosen profession, but have been and continue to be precluded from such employment as a direct result of the actions of the defendants and in retaliation for plaintiff Downie exercising his constitutional rights of free speech, free expression and free association, and such actions violate plaintiffs' constitutionally protected rights guaranteed under the First and Fourteenth amendments to the U.S. Constitution.

> Count II:  The actions of the defendants, in maintaining false information about plaintiff Downie in both the national police computers and in the afore-mentioned "blackball memo," constitute a violation of plaintiffs' First Amendment rights, in that such actions were taken in retaliation for plaintiffs exercising their legitimate and protected First Amendment rights, i.e., exposing governmental corruption.

> Count XI:  The acts of all defendants, acting in concert with others, constitutes a conspiracy to deprive plaintiffs of their constitutionally-guaranteed civil rights.

J.A. at 25-27, 31 (Compl.).  These counts allege wrongs that could be addressed under the Privacy Act.  5 U.S.C. § 552a(g)(1)(C) & (D); *see also Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001) ("The Privacy Act of 1974

---

[7]We emphasize that we only address here claims involving the creation, maintenance, and dissemination of false records by federal agency employees.  In other contexts, we have recognized that a *Bivens* remedy may be implied under the First Amendment.  *See, e.g., Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000); *Lavado v. Keohane*, 992 F.2d 601 (6th Cir. 1993).