**INTERNATIONAL UNION, SECURITY, POLICE, AND FIRE PROFESSIONALS OF AMERICA (SPFPA), and Robert Columbia, Plaintiffs,**

v.

**UNITED STATES MARSHAL'S SERVICE, Defendant.**

**No. 04 Civ. 2234(SHS).**

United States District Court, S.D. New York.

Dec. 27, 2004.

---

James Michael Reif, Robert Columbia, Gladstein Reif and Meginniss, New York City, Mark L. Heinen, Detroit, MI, for plaintiffs.

## OPINION & ORDER

STEIN, District Judge.

Robert Columbia, formerly an interim security officer for the United States Marshal's Service, has brought this action, along with his union, against the Marshal's Service on the ground that he was improperly terminated after failing to pass a vision test. The Marshal's Service has now moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment in its favor pursuant to Fed.R.Civ.P. 56. For the reasons that follow, defendant's motion for summary judgment is granted.

### I. Factual Background

The United States Marshal's Service provides uniformed, armed security guards, known as Court Security Officers ("CSOs"), to protect United States Courthouses and United States Attorneys' offices. (Compl. ¶¶ 5b, 7). Private companies directly employ the CSOs and the Marshal's Service contracts with those companies for the services of the CSOs. (Compl. ¶¶ 10–12). Akal Security, Inc. is one such private contractor. (Compl.

¶ 5a). Plaintiff International Union, Security, Police and Fire Professionals of America ("the Union") is the exclusive bargaining representative for CSOs employed by Akal. (Compl. ¶ 5b).

Akal Security employees belong to a bargaining unit covered by a collective bargaining agreement that provides that, "After completion of the probationary period, no Employee shall be dismissed or likewise disciplined without just cause, unless the Employee's credentials are denied or terminated by the Marshals Service." (Compl. ¶ 5b; CBA, Art. 6, § 6.1, Robinson Decl. Ex. A).

As part of the application process, CSO applicants must pass a medical examination, and in 2000 the Judicial Conference of the United States adopted heightened medical standards for the CSOs and required the Marshal's Service to enforce those new standards. (Compl. ¶¶ 15, 16; Gaglon Decl. ¶ 6). In January of 2001, the Marshal's Service released a medical examination form that contained the new standards. (Compl. ¶ 17). The Marshal's Service also amended its service contract with Akal so that the contract incorporated the new medical standards. (Compl. ¶¶ 18–19; Judicial Security Contract Between the Marshal's Service and Akal (the "contract"), §§ C–8(e) & J–2, Robinson Decl. Ex. A).

Specifically, the Marshal's Service amended section C–8(e) of the contract between the Marshal's Service and Akal to require that each CSO meet the "health certification requirements listed in USM–229, Certificate of Medical Examination for Court Security Officers form," and appended form USM–229 to the contract as Attachment 2(H). The contract stated that the failure to meet the medical standards disqualified an applicant for employment. (Contract, § C–8(e), Robinson Decl. Ex. A). The Marshal's Service also amended

the contract to briefly outline the medical standards in the body of the contract itself. (Contract, §§ C–8(e)(1)–(12), Robinson Decl. Ex. A). The amended contract took effect on October 1, 2002. (Solicitation/Contract Form Robinson Decl. Ex. A).

Apart from heightening its medical standards, the Marshal's Service also changed the process by which CSO applicants are medically evaluated. Previously, the examining physician himself or herself would certify the applicant as medically fit. (Compl. ¶ 20). Under the new procedure, however, the examining doctor and the applicant would complete the exam form and send it to the private contractor—in this case, Akal—which would then forward the medical report to the Marshal's Service. (Compl. ¶ 20; Gaglon Decl. ¶ 2). Because the Marshal's Service lacks medical expertise, it in turn would forward the report to the U.S. Public Health Service's Office of Federal Law Enforcement Medical Program ("the Public Health Service"), where a medical review officer would determine whether the applicant were medically fit to be a CSO. (Gaglon Decl. ¶¶ 4, 6).

If the medical review officer finds the applicant to be medically disqualified or if he requires additional information in order to make a determination, that officer then notifies the private contractor, who then has 30 days in which to respond. (Gaglon Decl. ¶¶ 2, 4). If the Marshal's Service receives responsive information, it forwards that information to the Public Health Service for further review. (Gaglon Decl. ¶ 4).

During the pendency of medical review, the Marshal's Service may appoint a CSO applicant on an interim basis, subject to the final outcome of the medical evaluation. (Gaglon Decl. ¶ 3). After reviewing all the responsive information, if the medical review officer nonetheless concludes

that the interim CSO appointee is medically disqualified, then the Marshal's Service notifies the private contractor of that decision and requests that the contractor remove the interim appointee from CSO duty. (Gaglon Decl. ¶ 5). The Marshal's Service never published the new standards or procedures in the Federal Register. (Compl. ¶ 22).

On October 15, 2002—two weeks after the new standards and procedures took effect—plaintiff Robert Columbia and his examining physician completed Columbia's USM–229 Certificate of Medical Examination form. (Certificate of Medical Examination for Court Security Officers ("certificate"), Gaglon Decl. Ex. A). Approximately one month later, the Marshal's Service granted Columbia interim approval to begin working as a CSO "pending the completion of the full background investigation and a review of his medical qualifications." (Memorandum of Marc A. Farmer of Mar. 11, 2003, Gaglon Dec. Ex. B). In granting the interim approval, the Marshal's Service notified Akal that "if negative information is received as a result of Mr. Columbia's medical review or Background Investigation, his removal may be required." (Memorandum of Marc A. Farmer of Mar. 11, 2003, Gaglon Dec. Ex. B).

Akal immediately assigned Columbia to be a CSO in the United States Attorneys' office in the Southern District of New York. (Compl. ¶ 5a). At the same time, the medical review officer determined that he needed additional information before certifying Columbia as medically fit because his color vision examination was incomplete. The medical review officer therefore asked Columbia to provide the results of a specific color vision test. (Medical Review Form of Mar. 12, 2003, Gaglon Decl. Ex. A).

Columbia took the required vision test and supplemented his medical record on April 22, 2003. (Medical Review Form of May 21, 2003, Gaglon Decl. Ex. A). One month later, the medical review officer determined that the test results were not acceptable because Columbia had taken the vision test while wearing tinted lenses or glasses. (Medical Review Form of May 21, 2003, Gaglon Decl. Ex. A). Accordingly, the medical review officer requested that Columbia take the vision test without tinted lenses or glasses. (Medical Review Form of May 21, 2003, Gaglon Decl. Ex. A).

Columbia took the test as requested and his doctor submitted the results. The medical review officer then determined that Columbia was not medically qualified to be a CSO because he had a "significant color vision deficit" that impaired his "ability to recognize basic colors" and could affect his ability to identify and describe "persons, vehicles, and buildings" as well as recognize "brake lights and road warnings signs and signals, especially during pursuit driving and emergency situations." He concluded that, "Your color vision impairment poses a significant risk to the health and safety of yourself and others in the performance of the essential functions of the job." (Medical Review Form of July 17, 2003, Gaglon Decl. Ex. A).

The Marshal's Service notified Akal that Columbia "does not meet the medical standards and functional requirements for the safe and efficient performance of [CSO] duties" and he was "therefore medically disqualified." (Letter of Marc A. Farmer of Aug. 13, 2003, Gaglon Dec. Ex. C). Two days later, Akal discharged Columbia, who, along with his union, commenced this litigation against the Marshal's Service. (Compl. ¶ 5a).

## II. The Complaint

The Complaint sets forth four claims for relief. In Count I, plaintiffs allege several violations of the Privacy Act, 5 U.S.C. § 552a. In particular, they allege that the Marshal's Service violated the Privacy Act by failing to publish its new standards and procedures in the Federal Register; by disclosing Columbia's medical certificate to the Public Health Service; by failing to provide any mechanism for Columbia to review and amend his records; by placing irrelevant and unnecessary information into its records system; and by failing to promulgate rules concerning the records system.

In Count II, plaintiffs allege that the failure of the Marshal's Service to publish the new medical standards and procedures in the Federal Register violated the Office of Federal Procurement Policy Act, 41 U.S.C. § 401, et seq. and claim they can challenge this alleged violation pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

In Count III, plaintiffs allege that Columbia's right to due process was violated in two way: first, by firing him in violation of the Privacy Act and second by depriving him of a protected property interest—his job—without due process of law.

Finally, in Count IV plaintiffs assert a claim pursuant to the Back Pay Act, 5 U.S.C. § 5596, et seq.

The Marshal's Service has now moved to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6), or in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiffs have conceded that Count IV is "premature." (Pls.' Mem. in Opp. to Summ. J. at 24). The Court now turns to the standards applicable to defendant's motion.

## III. The Motion Will Be Treated as a Motion for Summary Judgment

Although the Marshal's Service denominates its motion as seeking an order dismissing the Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) "or in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56," (Notice of Motion at 1), it treats the motion as one made pursuant to Rule 56. Specifically, in support of its motion it submits a statement of the material facts as to which it contends there is no issue to be tried pursuant to Local Civil Rule 56.1, as well as affidavits and exhibits in support; plaintiffs similarly treat the motion as one for summary judgment, with a countervailing Rule 56.1 statement and affidavits and exhibits. Accordingly, the Court will treat the motion as one for summary judgment. *See Sira v. Morton,* 380 F.3d 57, 68 (2d Cir.2004) (quoting *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999)).

## IV. The Standard for Summary Judgment

The Court may grant summary judgment only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004).

The nonmoving party "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" supporting its version of events.

*Id.* (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)). Ultimately, in order to defeat a motion for summary judgment, the nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Golden Pacific Bancorp,* 375 F.3d at 200 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotes omitted)).

Nonetheless, because the nonmoving party must have the opportunity to unearth facts essential to its claims, "only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Vet. Affairs,* 201 F.3d 94, 97 (2d Cir.2000).

## V. Discussion

### A. Count I: Privacy Act Claims

■ The Privacy Act does not allow recovery for "mere administrative error." *Dowd v. IRS,* 776 F.2d 1083, 1084 (2d Cir.1985). To state a Privacy Act claim a plaintiff must show that: 1) the information at issue is a record contained within a system of records; 2) the agency violated the Act with respect to that record; 3) the disclosure had an adverse effect on the plaintiff; and 4) the violation was willful or intentional. *Quinn v. Stone,* 978 F.2d 126, 131 (3d Cir.1992); *Mandel v. U.S. Office of Pers. Mgmt.,* 244 F.Supp.2d 146, 150 (E.D.N.Y.2003); *Germosen v. Cox,* 1999 WL 1021559 at *18 (S.D.N.Y.1999).

■ The adverse effect requirement consists of both a standing element and a causation element. *Quinn,* 978 F.2d at 131; *Mandel,* 244 F.Supp.2d at 150. "In order to establish the requisite causal connection, a plaintiff must demonstrate a close nexus between the [violation] and the adverse effect alleged." *Mandel v. U.S. Office of Pers. Mgmt.,* 79 Fed.Appx. 479, 2003 WL 22469719 at *2 (2d Cir.2003); *see also Cardamone v. Cohen,* 241 F.3d 520, 529–30 (6th Cir.2001); *Sullivan v. U.S. Postal Serv.,* 944 F.Supp. 191, 197 (W.D.N.Y.1996).

Plaintiffs assert two adverse effects of the claimed violations: first, that Columbia was fired; and second, that he was unable to make an informed career choice because he did not know that the heightened medical standards were in effect. Because plaintiffs allege several different Privacy Act violations, the Court will address each alleged violation in turn.

#### 1. Failure to Publish a Description of the Medical Records System

■ Plaintiffs allege that the Marshal's Service violated 5 U.S.C. § 552a(e)(4)—which requires a federal agency to publish any revision to its "system of records" in the Federal Register—and that the failure to publish the revision caused Columbia to lose his job and deprived him of the opportunity to make an informed choice as to whether to apply for a CSO position in the first place. The Marshal's Service asserts that even if it were required to publish such a description—a question this Court assumes without deciding—the violation did not proximately cause either adverse effect.

The Court agrees with the Marshal's Service that the requisite causal connection is lacking between defendant's failure to publish and Columbia's discharge. Columbia was discharged for the sole reason that he failed to meet certain objective medical criteria. Plaintiffs have failed to offer any evidence tending to show that the medical standards or the result of Columbia's medical examination would have been different if the Marshal's Service had published a description of the record sys-

tem in the Federal Register. Thus, there is no basis upon which a reasonable juror could conclude that publication would have made any difference to Columbia's discharge.

Additionally, the necessary causal nexus does not exist with respect to Columbia's asserted inability to make an informed career choice. Columbia avers that if the new medical standards had been published and later implemented, he "would have directed [his] post-NYPD career elsewhere and would not have accepted employment as a CSO." (Columbia Decl. ¶ 10). However, apart from Columbia's bare post hoc assertion, there is nothing at all to support the notion that Columbia would have even been aware of the publication in the Federal Register. Most crucially, Columbia makes no claim that he checked the Federal Register prior to applying for a CSO position, or even knew of the existence of the Federal Register.

Moreover, there is evidence that Columbia was indeed aware of the heightened medical standards and still pursued employment as a CSO. First, plaintiffs agree that the Marshal's Service released the new medical standards in January of 2001, but that Columbia did not even apply until October of 2002, almost two years later. (Compl. ¶ 17; Def.'s Statement of Facts ¶¶ 1, 4; Pls.' Statement of Facts ¶¶ 1, 4). Additionally, the contract between the Marshal's Service and Akal—which directly employed Columbia—expressly incorporates the medical standards applied to Columbia and states that failure to meet those standards will disqualify an applicant for employment. (Contract, § C–8(e), Robinson Decl. Ex. A). Indeed, the contract specifically states that, "Ability to distinguish basic colors, as well as shades of color, is required." (Contract § C–8(e)(1), Robinson Decl. Ex. A). Moreover, once Columbia applied, he was required to

complete with his doctor the USM–229 Certificate of Medical Examination form, which includes a separate section for "color vision" testing. (USM–229 Certificate of Medical Examination Form, Part II(2)(C), Gaglon Decl. Ex. A). At that point, he certainly had notice of the medical standards. Nonetheless, he continued the application process. Columbia even exchanged two rounds of additional material with the medical review officer when, knowing of the color vision standard, he was free to withdraw his application at any time.

Given the fact that Columbia does not claim that he checked the Federal Register prior to applying with Akal and given that Columbia became aware of the vision requirement no later than when he was required to complete the medical certificate, no reasonable juror could conclude that publication of the heightened medical standards in the Federal Register would have prevented Columbia from applying for a CSO position. The Court thus grants defendant's motion for summary judgment on Count I to the extent that Count I relies upon defendant's failure to publish a description of its record system in the Federal Register.

2. *Disclosure of Columbia's Medical Form to the Public Health Service*

■ Plaintiffs allege that the disclosure of Columbia's medical form to the Public Health Service for assessment by a medical review officer violated 5 U.S.C. 552a(b), which prohibits the disclosure of any record without the "prior written consent" of the "individual to whom the record pertains." Defendant responds, inter alia, that there is no causal connection between the disclosure and any adverse effect.

As set forth above, the record demonstrates that the Marshal's Service discharged Columbia because he failed to

satisfy a vision requirement. There is nothing in the record to support the position that the result of Columbia's medical examination would have been any different if the Marshal's Service had reviewed his medical records internally instead of sending them to the Public Health Service for review. In either case, the identical medical standard would have been applied to Columbia. There is simply no direct causal nexus between the disclosure of Columbia's medical records to the Public Health Service and Columbia's discharge, which turned entirely on his inability to meet an objective medical standard. That lack of causation is fatal to plaintiffs' claim. *See Cardamone v. Cohen,* 241 F.3d 520 (6th Cir.2001); *Mandel v. U.S. Office of Pers. Mgmt.,* 244 F.Supp.2d 146 (E.D.N.Y.2003).

Accordingly, defendant's motion for summary judgment on Count I is granted to the extent that Count I relies upon the disclosure of Columbia's medical records to the Public Health Service.

### 3. *Failure to Provide for the Review and Amendment of Records*

Plaintiffs allege that the Marshal's Service did not provide a mechanism for Columbia to review and amend his medical records, which constitutes a violation of 5 U.S.C. § 552a(d). The Marshal's Service responds that it did in fact provide such a mechanism.

The Marshal's Service is correct. The notice contained in the Federal Register at 64 Fed.Reg. 60,842, 60,843 (Nov. 8, 1999) describes the manner in which Columbia could have reviewed or amended his records. Indeed, it specifically states that it covers the review and amendment procedures for records used to make "security/suitability determinations in the hiring of CSO's," including records "related to the initial screening process for eligibility . . . ." 64 Fed.Reg. 60,842 (Nov. 8,

1999). Medical records were most certainly an integral part of the screening process. Thus, the Court finds that this notice sufficiently described the mechanism for review and amendment of medical records. Defendant's motion for summary judgment is thus granted to the extent that Count I relies upon the alleged failure to provide a mechanism for the review and amendment of medical records.

### 4. *Incorporating Irrelevant and Unnecessary Information*

■ Plaintiffs allege that by maintaining a record of Columbia's medical disqualification, the Marshal's Service violated 5 U.S.C. § 552a(e)(1), which permits an agency to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency . . . ."

By statute, the Marshal's Service has the primary responsibility of providing security services in the United States Courthouses. 28 U.S.C. § 566(a). As a general matter, the relationship between the medical condition of a CSO and his ability to provide effective security is clear. A CSO may have to "subdue violent or potentially violent people." (Contract, § C–9(a), Robinson Decl. Ex. A). Moreover, the job "requires frequent and prolonged walking, standing, running, sitting, and stooping." (Contract, § C–9(a), Robinson Decl. Ex. A). A CSO's physical condition directly bears on his ability to perform those very physical tasks.

More particularly, a CSO's ability to distinguish between colors may very well affect his ability to perform necessary tasks. For example, the Medical Review Form finally disqualifying Columbia noted specific job functions that his vision deficiency could affect; namely, the "identification or descriptions of persons, vehicles, and buildings, which is important in officer-to-

officer communication and in court testimony, as well as recognition of brake lights and road warning signs and signals, especially during pursuit driving and emergency situations." (Medical Review Form of July 17, 2003, Gaglon Decl. Ex. A). Thus, vision requirements help ensure that CSOs will be able to execute tasks that directly relate to the security of U.S. Courthouses and U.S. Attorneys' offices.

Plaintiff, however, has come forward with no evidence undermining the relevance to the Marshal's Service's statutory mission of medical standards generally or vision requirements particularly. Accordingly, no rational juror could conclude that defendant incorporated irrelevant material into its system of medical records. Defendant's motion for summary judgment on Count I is granted to the extent that Count I relies upon defendant's retention of Columbia's medical records.

### 5. *Failure to Promulgate Rules Pursuant to 5 U.S.C. § 553*

■ Plaintiffs also allege that when the Marshal's Service failed to promulgate rules concerning its system of records, it violated the Administrative Procedure Act's notice and comment rule-making provision in 5 U.S.C. § 553, which is incorporated into the Privacy Act at 5 U.S.C. § 552a(f). The Marshal's Service responds that 5 U.S.C. § 553(a)(2) exempts from the notice and comment requirements any agency action relating to personnel or contracts.

Section 553(a)(2) exempts from the APA's normal procedural requirements matters "relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." The District of Columbia Circuit has held that this exemption applies when "any one of the enumerated categories is clearly and directly involved in the regulatory effort at issue." *Humana of South Carolina, Inc.*

*v. Califano*, 590 F.2d 1070, 1083 (D.C.Cir. 1978) (internal quotations omitted); *see also Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 232 (D.C.Cir.1976); *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir.1971).

The agency action here directly implicates two categories enumerated in 5 U.S.C. § 553(a)(2): personnel and contracts. Medical qualifications are indeed one of the most salient personnel considerations for the CSO system. The medical standards and certification procedures allow the Marshal's Service to determine which of its personnel and applicants can effectively perform the duties required of a CSO, and to tailor its workforce accordingly. Additionally, the Marshal's Service implemented the medical standards via contract with Akal—a fact that directly implicates defendant's ability to set the terms of its own personnel procurements.

Because this agency action directly concerns defendant's ability to set medical standards for its own personnel and to implement those standards through contract, § 553(a)(2) exempts defendant's medical standards and certification procedures from the notice and comment rule-making provisions of the APA. Plaintiffs' APA-based challenge therefore fails as a matter of law.

In sum, the Court grants defendant's motion for summary judgment as to Count I.

### B. *Count II: Claims Pursuant to the Office of Federal Procurement Policy Act and the Administrative Procedure Act*

In Count II, plaintiffs claim that the Marshal's Service violated § 418(b) of the Office of Federal Procurement Policy Act ("OFPPA"), 42 U.S.C. §§ 401 et seq., by failing to publish in the Federal Register

the new medical standards and the new qualification procedures. Plaintiffs claim that § 702 of the APA entitles them to judicial review of the alleged violation. The Marshal's Service responds that plaintiffs lack prudential standing to raise this issue.

■ When seeking review of an agency decision pursuant to § 702 of the APA, a plaintiff must possess both constitutional and prudential standing. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). To satisfy the prudential standing requirement, a plaintiff must show that the interest it seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Id.* (quoting *Ass'n of Data Processing Servs. Org., Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

■ The zone of interests test comprises two steps. First, the court must determine the interests that the statute arguably protects; second, the court must determine whether the plaintiff's interests affected by the defendant are among those interests that the statute protects. *Id.* at 492, 118 S.Ct. 927. This test does not require that Congress intended to benefit the plaintiff. *Id.* However, if the plaintiff's interests are only marginally related to or are inconsistent with the interests that the statute arguably protects, then the plaintiff lacks standing. *Id.* at 491, 118 S.Ct. 927.

Although the United States Court of Appeals for the Second Circuit has never articulated the interests that OFPPA protects, two other circuits have written on the issue and both have come to the same conclusion. The District of Columbia Circuit stated that, "Throughout the legislative history of OFPPA and its amendments, Congress emphasized economy and efficiency in government operations." *Nat'l Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1049 (D.C.Cir.1989). More recently the Sixth Circuit came to the identical conclusion that OFFPA protects the "interest in ensuring that government funds are spent efficiently." *Courtney v. Smith*, 297 F.3d 455, 465 (6th Cir.2002).

Defendant argues that plaintiffs' interests are either unrelated to or are inconsistent with government efficiency because plaintiffs seek to force the Marshal's Service to publish and solicit public comment on its new medical standards and certification procedures. Plaintiffs respond that the 1996 amendments to OFPPA enlarged the interests that OFPPA protects to include the "effective and timely solicitation of the viewpoints of interested parties in the development of procurement policies...." 41 U.S.C. § 405(d)(7).

However, the history of the 1996 amendments shows that those provisions did nothing to alter or enlarge the interests that OFPPA protects. Prior to the 1996 amendments, OFPPA's declaration of policy stated, "It is the policy of the Congress to promote economy, efficiency and effectiveness in the procurement of property and services by the executive branch of the Federal Government...." 41 U.S.C. § 401, *repealed by* National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, § 4305(2), 110 Stat. 186 (1996).

Through the 1996 amendments Congress did two things. First, Congress moved the statement of purpose to 41 U.S.C. § 404(a), which establishes the Office of Federal Procurement Policy and its Administrator. Second, Congress consolidated the statement of purpose with language already existing in § 404(a) so that it read: "There is in the Office of Management and Budget an Office of Federal

Procurement Policy (hereinafter referred to as the 'Office') to provide overall direction of Government-wide procurement policies, regulations, procedures, and forms for executive agencies and to promote economy, efficiency and effectiveness in the procurement of property and services by the executive branch of the Federal Government." National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, § 4305(1), 110 Stat. 186 (1996).

Plaintiffs contend that the inclusion of the phrase "to provide overall direction of Government-wide procurement policies, regulations, procedures, and forms for executive agencies" broadened the interests that OFPPA protects. Moreover, plaintiffs argue that placing the former statement of purpose in the section establishing the Office and its Administrator "elevates" the functions of the Administrator into the zone of interests that the statute protects. Those functions, including the "effective and timely solicitation of the viewpoints of interested parties in the development of procurement policies," are listed in the next section of the statute. *See* 41 U.S.C. § 405(d)(7).

Plaintiffs' argument fails for two reasons. First, ever since its inception in 1974 OFPPA has contained a provision stating that the Office of Federal Procurement Policy shall provide overall direction for procurement policies, regulations, procedures, and forms. Similarly, OFPPA has always contained a provision charging the Administrator with soliciting the viewpoints of interested parties. Office of Federal Procurement Policy Act, Pub.L. No. 93–400, §§ 3(b), 6(d)(2), 88 Stat. 796 (codified as amended at 41 U.S.C. §§ 401 *et seq.* (1974)). Despite the continued existence of these provisions, both the District of Columbia Circuit and the Sixth Circuit

held that OFFPA protected the interest in government efficiency.

Second, the House Conference Report on the 1996 amendments indicates that Congress merely meant to consolidate formerly disparate provisions of OFPPA rather than add new purposes, elevate any already existing purposes, or reorient the Act in any way. H.R. Conf. Rep. No. 104–450, at 969–70, U.S.Code Cong. & Admin.News 1996, pp. 238, 454, 455 ("The conference agreement includes a provision that would consolidate a number of provisions in the Office of Federal Procurement Policy Act concerning findings, policies, and purposes."). The 1996 amendments and their legislative history simply did not broaden the purpose of the statute in any meaningful way, but rather streamlined portions of the Act that formerly had been scattered while keeping intact the Act's central purpose of promoting governmental efficiency and ensuring the wise expenditure of the public fisc.

Plaintiffs' interests do not arguably fall within that established zone. In Count II, and throughout the Complaint generally, plaintiffs seek to compel the Marshal's Service to publish its new medical standards and certification procedures, as well as provide the opportunity to comment on them. Plaintiffs also seek a declaratory judgment that the new medical standards and procedures are null and void, and an injunction requiring the Marshal's Service to reinstate Columbia. These interests neither serve nor dovetail with the interest in governmental efficiency. In fact, in many ways these interests conflict with governmental efficiency since the notice and comment sought by plaintiffs would delay the implementation of more effective medical standards and procedures, and the declaratory judgment and injunction would hinder the Marshal's Service in replacing

disqualified employees with those it found better able to perform the job.

Because the interests that plaintiffs advance are inconsistent with the interest of governmental efficiency, plaintiffs lack prudential standing to sue pursuant to § 702 of the APA. Accordingly, the Court grants defendant's motion for summary judgment with respect to Count II.

## C. Count III: Due Process Claims

In Count III, plaintiffs allege two kinds of due process violations: first, that the Marshal's Service disqualified Columbia in violation of the Privacy Act and thus without due process of law; and second, that the decision to disqualify Columbia and revoke his interim appointment was so procedurally deficient as to be unconstitutional.

Before constitutional due process safeguards attach to either claim, however, Columbia must demonstrate that he possessed a protectable property interest in continued employment as a CSO. *Bd. of Regents of State Coll. v. Roth,* 408 U.S. 564, 569–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The "terms of his appointment" define whether Columbia possessed such an interest. *Id.* at 578, 92 S.Ct. 2701. A collective bargaining agreement between a union and a private employer is a term of employment for the purposes of due process analysis even though the government entity is not a party to that contract. *Stein v. Bureau of Pupil Trans.,* 792 F.2d 13 (2d Cir.1986). Here, the express terms of Columbia's employment show that as a matter of law Columbia did not have "a legitimate claim of entitlement" to continued employment as a CSO. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

Initially, the CBA governing the relationship between Columbia's bargaining unit and Akal expressly provides that even after the 60–day probationary period a CSO may be dismissed without just cause if his "credentials are denied or terminated by the Marshals Service." (CBA, Art. 6, § 6.1, Robinson Decl. Ex. A). *Cf. Horvath v. Westport Library Ass'n.,* 362 F.3d 147, 151 (2d Cir.2004); *Harhay v. Ellington Bd. of Educ.,* 323 F.3d 206, 212 (2d Cir. 2003); *Wilson v. MVM, Inc.,* 2004 WL 1119926 at \*3 (E.D.Pa.2004); *Int'l Union, United Gov't Sec. Officers of Am. v. United States Marshall Serv.,* No. 02–1494, slip op. at 2, 10 (D.D.C. Aug. 28, 2003).

Additionally, the contract between Akal and the Marshal's Service expressly provides that each CSO applicant *"must* meet the health and certification requirements listed in the USM–229, Certificate of Medical Examination for Court Security Officers form," and that "[f]ailure to meet any one of the required medical and/or physical qualifications *will* disqualify any employee for appointment." (Contract, § C–8(e), Robinson Decl. Ex. A) (emphasis added). Thus, the two documents setting forth the terms of CSO employment do not establish any entitlement to employment, but rather condition employment on an applicant's ability to satisfy the particular medical standards of the Marshal's Service.

Further, the terms of Columbia's individual employment made crystal clear that his appointment depended upon his satisfying defendant's medical standards. The Marshal's Service did not hire Columbia in any final sense but rather granted him only "interim approval to start work." (Memorandum of Marc A. Farmer of Mar. 11, 2003, Gaglon Dec. Ex. B). Farmer made the interim appointment "pending the completion of the full background investigation and a review of [Columbia's] medical qualifications" and stated that "if negative information is received as a result of Mr. Columbia's medical review or Background Investigation, his removal may be

required." (Memorandum of Marc A. Farmer of Mar. 11, 2003, Gaglon Dec. Ex. B).

Plaintiffs contend that despite the terms of his engagement Columbia was not in fact an interim employee because the contract between the Marshal's Service and Akal provides, "No CSO employee must be allowed to perform services under the CSO program until [the medical certificate] has been submitted to and approved by the Judicial Protective Services Program." (Contract § C–8(e), Robinson Decl., Ex., A). Moreover, plaintiffs point out that the CBA grants full seniority to an employee after 60 days and since Columbia worked more than 150 days before his discharge, he had achieved full seniority status. (CBA Art. II, § 2.4, Robinson Decl. Ex. A). These two provisions, plaintiffs claim, establish Columbia's property interest in continued employment.

However, the contract provision referred to above does not prevent the Marshal's Service from making interim appointments. (Gaglon Decl. ¶ 3). Instead of curtailing defendant's authority to manage its own personnel, the contract provision merely sets forth that the Marshal's Service is under no obligation to allow an employee to work as a CSO prior to medical certification. The contract language certainly does not create a legitimate entitlement, especially when the contract explicitly makes employment conditional upon medical certification.

As for Columbia's claim that he had achieved full seniority because he had worked more than 60 days before his interim employment was terminated, section 6.1 of the CBA expressly states that the Marshal's Service may revoke or deny credentials even after the 60–day probationary period, which is what occurred here. Accordingly, Columbia had no legitimate entitlement to continued employment.

Last, plaintiffs proffer that 48 C.F.R. § 24.102 (2004), which requires compliance with the Privacy Act, creates a property right in the "protection of individual privacy." In support of this amorphous claim, plaintiffs cite *Young v. United States,* 498 F.2d 1211 (5th Cir.1974) and *Am. Fed'n of Gov't Employees v. Callaway,* 398 F.Supp. 176 (N.D.Ala.1975).

However, neither of these cases remotely stands for the principle that plaintiffs claim. In *Young,* the Fifth Circuit found that a host of federal regulations created a property interest because those regulations specifically circumscribed the reasons for which an employee could be discharged. *Young,* 498 F.2d at 1219–20. By contrast, 48 C.F.R. § 24.102 (2004) merely states that an agency must apply the Privacy Act when it contracts for the development or operation of a system of records; the regulation makes no mention of employment entitlements or permissible grounds for discharge. *Callaway* is also inapposite, as that case concerned property rights grounded in the Lloyd–LaFollette Act as well as "other sources too numerous" to count. *Callaway,* 398 F.Supp. at 194–95.

On this record, no reasonable juror could find that Columbia possessed a constitutionally protectable property interest in continued employment. The Court therefore grants defendant's motion for summary judgment on Count III of the Complaint.

## VI. Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted as to Counts I through III of the Complaint. The Court also dismisses Count IV without prejudice upon plaintiffs' concession that it was premature. The Clerk of Court is directed to enter judg-

ment dismissing Counts I through III of the Complaint with prejudice and Count IV of the Complaint without prejudice.